**FIRST DIVISION**
**ELLINGTON, C. J.,**
**PHIPPS, P. J., and DILLARD, J.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)**
**http://www.gaappeals.us/rules/**

**March 28, 2013**

# In the Court of Appeals of Georgia

A12A2202. GOD'S HOPE BUILDERS, INC., et al. v. MOUNT
ZION BAPTIST CHURCH OF OXFORD, GEORGIA, INC.,
et al.

A12A2251. GOD'S HOPE BUILDERS, INC., et al. v. MOUNT
ZION BAPTIST CHURCH OF OXFORD, GEORGIA, INC.,
et al.

A12A2252. GOD'S HOPE BUILDERS, INC., et al. v. MOUNT
ZION BAPTIST CHURCH OF OXFORD, GEORGIA, INC.,
et al.

DILLARD, Judge.

In this case involving a dispute over church property, Mount Zion Baptist

Church of Oxford, Georgia, Inc. (the "church"), a domestic non-profit corporation,

and 34 individuals claiming to be members of the church, including the church's

pastor (collectively "plaintiffs"), filed a lawsuit against Clayton Dial and Angela

Ballard, as officers of the church, and God's Hope Builder's, Inc. ("GHB"), also a

domestic non-profit corporation (collectively "defendants"), seeking, *inter alia*, injunctive and declaratory relief. Specifically, the plaintiffs alleged that Dial and Ballard unlawfully conveyed all of the church's real property and assets to GHB and, therefore, plaintiffs sought to both enjoin the defendants from wasting the property and to set aside the conveyance. After the parties stipulated to a bench trial on the limited issues of whether plaintiffs had standing to contest defendants' actions and whether Dial's conveyance of the property was lawful, the trial court ruled in plaintiffs' favor and ordered GHB to convey the disputed property back to the church.

However, with other issues remaining unresolved, the trial court did not issue a final judgment. Consequently, defendants filed a motion requesting that the trial court order a meeting to allow the church membership to vote on whether to ratify the property conveyance. Plaintiffs responded by filing a motion for summary judgment, arguing that defendants had no standing to request such a meeting because the church had recently voted to expel them from membership. Following a hearing, the trial court granted plaintiffs' motion and, shortly thereafter, it granted plaintiffs' motion for a supersedeas bond.

In Case No. A12A2202, defendants appeal the trial court's order issued after the bench trial, arguing that the trial court erred in ruling that (1) the plaintiffs were

proper members of the church and, thus, had standing to contest defendants' actions; (2) plaintiffs' complaint was not barred by statute; and (3) defendant Dial did not have the authority to convey the church's property. In Case No. A12A2251, defendants contend that the trial court erred in granting plaintiffs' motion for partial summary judgment, which argued that defendants had been expelled as church members and had no standing to request a court-ordered special meeting. And in Case No. A12A2252, defendants contend that the trial court erred in granting plaintiffs' motion for a supersedeas bond. For the reasons set forth *infra*, we find that the record was insufficient to allow the trial court to determine the crucial threshold issue of whether the plaintiffs represented a majority of the church and, thus, had standing to contest defendants' actions. Accordingly, we vacate the trial court's rulings and remand the case for further proceedings consistent with this opinion.

The record shows that the Mount Zion Baptist Church of Oxford, Georgia, was founded in the mid-nineteenth century and, indeed, pre-dated the 1845 formation of the Southern Baptist Convention, with which it affiliated shortly thereafter. In 1995, the church incorporated and adopted a constitution and bylaws, which were replaced in 2000. The constitution reiterated the church's Southern Baptist affiliation, providing in relevant part:

3

> As far as may be consistent with the principles and teaching of the Bible, this church shall cooperate with and have representation in the denominational causes sponsored by Southern Baptists including the Southern Baptist Convention, State Convention, and City Association, and other affiliated auxiliaries and causes of Baptist churches of the city, state, nation and world.

Additionally, the bylaws established requirements for membership, established church officers and their respective duties, and provided the church's organization and general governance.

Angela Ballard is a member of the church and has served in several of the church's officer positions, including financial secretary/treasurer and clerk. Clayton Dial is Angela Ballard's father and has been a member of the church for over 50 years. At the time of the events that gave rise to this litigation, he served as the church's sole deacon. In addition to various other powers conferred upon the church's deacons, the bylaws provide that "[t]he property and business of the corporation shall be managed by its Board of Directors (also referred to as its Deacon Body)."

Throughout the years, attendance at the church had fluctuated, but by February 2010, only a dozen or so people regularly attended Sunday worship services. Around that same time, the church was searching for a new pastor, and Dial and Ballard were

4

put in contact with Pastor Christopher Shannon Allen. And although Pastor Allen had been ordained in an Independent Baptist Church and had only preached in Independent Baptist churches, Dial nevertheless invited him to preach at Mount Zion in early February 2010 and extended this invitation each week for the next four or five weeks.[1] Finally, in the middle of March 2010, Dial asked Allen to be the church's full-time pastor, Allen accepted, and the church voted in favor of his hiring.

Over the course of the next few months, church attendance began to rise as did church membership. Many of these new members purportedly joined the church at the end of Sunday worship services by going before the congregation at the front of the church, professing their faith, and expressing their wish to become a member, at which point the congregation, including Dial, voted to welcome them as new members. And by the beginning of July 2010, the church's congregation had grown to the extent that approximately 50 to 60 people regularly attended Sunday worship services, and many of these same people also attended and voted in church business meetings.

---

[1] Neither party disputes the fact that Allen was not the first Independent Baptist to preach or serve as pastor at Mount Zion. In fact, the church had a history of hiring both Independent and Southern Baptists as pastors.

On Sunday, July 4, 2010, Dial announced during the worship service that as chairman of the deacons, he was freezing membership in the church for a period of 50 days and that a special meeting to discuss membership would be scheduled for July 7, 2010. This announcement surprised Pastor Allen, as well as many others in the congregation, as Dial had given no previous indication that he was dissatisfied with any of the pastor's actions or the inductions of the new members.

On July 7, 2010, Dial and Ballard arrived at the church with an attorney, who they had retained to mediate the meeting. The attorney opened the meeting by informing those in attendance of Dial and Ballard's contention that individuals who had purportedly joined the church since March 2010 had not been properly admitted into membership. Unsurprisingly, many of the new members became upset and vociferously disputed Dial and Ballard's assertion. At that point, the attorney suggested that the issue be resolved by immediately voting on the new members; however, Dial rejected this suggestion and then summarily dismissed the attorney from the proceedings. Shortly thereafter, Dial and Ballard also abandoned the meeting, but those remaining decided to hold a vote to confirm the membership of those who had joined the church since March 2010.

Fearing that the church was being taken over by Independent Baptists, on August 5, 2010, Dial—as the sole director of the church's corporation—conveyed the church's property and assets, via warranty deed and bill of sale, to God's Hope Builders, a non-profit corporation affiliated with the Southern Baptist Convention. Dial received no consideration from GHB for conveying the property and assets, and one of GHB's directors testified (which Dial disputes) that the corporation was holding the church's property until a new church could be formed, even though the conveyance placed no restrictions on GHB's use of the property. On the Sunday following the conveyance, members of the church, including Pastor Allen, arrived to find the church locked and "No Trespassing" signs posted on the property. And when Pastor Allen telephoned Dial to inquire about the situation, Dial informed him of the property conveyance. Subsequently, however, Dial, Ballard, members of their family, and a few others sympathetic to their actions began worshiping at the church as a separate congregation.

Shortly thereafter, Allen and 36 other purported members of the church filed a complaint on the church's behalf, in which they alleged, *inter alia*, that Dial and Ballard unlawfully conveyed all of the church's real property and assets to GHB and in which they sought to both enjoin the defendants from wasting the property and set

aside the conveyance. Defendants answered the complaint, and after a significant discovery period, the parties agreed to a bench trial that would be conducted for the limited purpose of determining whether the plaintiffs constituted a majority of the church sufficient to confer standing to represent the church and whether Dial's conveyance of the church's property and assets was lawful.

A few months later, a three-day bench trial was conducted, during which numerous witnesses testified, including Dial, a director of GHB, and several, but not all, of the purported members. In addition, dozens of exhibits—including the church's articles of incorporation and corporate bylaws—were submitted as evidence. And two months after the bench trial concluded, on July 6, 2011, the trial court issued an order finding that the plaintiffs represented a majority of the church and, thus, had standing to bring the action. The court further held that Dial's conveyance of the church's property and assets was unlawful. Consequently, the trial court ordered GHB to convey the property and assets back to the church.

Because other issues in the case remained unresolved, the trial court's order was not initially deemed final, and shortly after it was issued, defendants filed a motion requesting that the court order a meeting for the church membership to vote either to ratify or repudiate the conveyance of the church property and assets to GHB.

8

In response, plaintiffs filed a motion for partial summary judgment, arguing that, as the majority of the church, plaintiffs had voted to expel Dial, Ballard, and nine others as members of the church and, therefore, defendants lacked standing to request a court-ordered meeting of the membership. The trial court agreed and issued orders granting plaintiffs' motion for partial summary judgment and denying defendants' motion for a court-ordered meeting.

Nearly six months later, the plaintiffs dismissed their remaining claims, and on December 21, 2011, the trial court made its July 6, 2011 order its final judgment. Defendants, after earlier filing a notice of appeal of the trial court's grant of plaintiffs' motion for partial summary judgment, then filed a notice of appeal of the trial court's final judgment. And prior to defendants' appeals being docketed, plaintiffs filed a motion for supersedeas bond, which the trial court also granted. Defendants filed a notice of appeal of this latest order as well. These consolidated appeals follow.

At the outset, we note that while we apply a *de novo* standard of review to any questions of law decided by the trial court, "factual findings made after a bench trial shall not be set aside unless clearly erroneous, and due regard shall be given to the

opportunity of the trial court to judge the credibility of witnesses."[2] Indeed, because the clearly-erroneous test in effect employs the same standard as the any-evidence rule, "appellate courts will not disturb fact findings of a trial court if there is any evidence to sustain them."[3] With these guiding principles in mind, we now turn to defendants' specific claims.

In Case No. A12A2202, in their first enumeration of error, defendants contend that the trial court erred in finding that the plaintiffs represented a majority of the church's membership and, therefore, had standing to sue on behalf of the church. Because we find that the record was insufficient to allow the trial court to definitively determine this crucial threshold issue, we vacate, for the time being, all of the trial court's rulings on appeal and remand the case for further proceedings consistent with this opinion.

It is well established that the principles embodied in the First Amendment to the United States Constitution[4] and its counterpart provisions in the Georgia

---

[2] *Washington v. Harrison*, 299 Ga. App. 335, 336 (682 SE2d 679) (2009) (punctuation omitted); *see* OCGA § 9-11-52 (a).

[3] *Washington*, 299 Ga. App. at 336 (punctuation omitted).

[4] U.S. Const., amend. I ("Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . .").

Constitution[5] preclude our courts from "deciding questions involving a church's internal affairs in matters of theology, church discipline, or church governance."[6] Specifically, courts may not inquire into a controversy relating to matters of faith, teaching, doctrine, and discipline of a church, "such as expulsion from membership, internal procedures, quorums, or determination of membership in the church."[7] However, this sacrosanct principle, which prevents a court from exercising jurisdiction over ecclesiastical matters, is not violated when "a court is called upon

---

[5] Ga. Const., art. I, sec. I, par. III-IV.

[6] *Smith v. Mount Salem Missionary Baptist Church*, 289 Ga. App. 578, 579 (1) (657 SE2d 642) (2008); *see Presbyterian Church in the U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449 (89 SCt 601, 21 LE2d 658) (1969) ("The First Amendment severely circumscribes the role that civil courts may play in resolving church property disputes"); *Anderson v. Dowd*, 268 Ga. 146, 147 (1) (485 SE2d 764) (1997) ("The constitutional guarantee of freedom of religion encompasses the power of religious bodies to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine") (citation and punctuation omitted).

[7] *Kim v. Lim*, 254 Ga. App. 627, 632 (2) (563 SE2d 485) (2002) (punctuation omitted); *see also United Baptist Church v. Holmes*, 232 Ga. App. 253, 253-254 (500 SE2d 653) (1998) ("The courts of Georgia under the First Amendment of the Constitution of the United States and [the] Constitution of Georgia are prohibited from determining issues of expulsion of members, pastors, and the internal procedures of a religious entity . . . .") (citation and punctuation omitted).

11

to decide a civil dispute over control of church property."[8] Indeed, civil courts do not inhibit free exercise of religion "merely by opening their doors to disputes involving church property."[9] In fact, our Supreme Court has acknowledged that in disputes involving congregational churches, courts of equity will take jurisdiction over disputes involving churches "when property rights are involved and when the suit is brought on behalf of a *majority* of the congregation."[10] Consequently, while as a general rule courts are precluded from inquiring into determinations of church membership, a trier of fact is "not forbidden to consider the composition of the church membership for the limited purpose of determining standing to bring a claim on behalf of the church membership."[11]

In the case *sub judice*, it is undisputed that the church is a congregational church and that the focus of this litigation is on the lawfulness of Ballard and Dial's

---

[8] *Smith*, 289 Ga. App. at 579 (1); *see also Bolden v. Barton*, 280 Ga. 702, 703-704 (632 SE2d 148) (2006) (same).

[9] *Presbyterian Church in the U.S.*, 393 U.S. at 449.

[10] *Gervin v. Reddick*, 246 Ga. 56, 57 (2) (268 SE2d 657) (1980) (emphasis supplied); *see also Howard v. Johnson*, 264 Ga. App. 660, 662 (1) (592 SE2d 93) (2003) (same); *cf.* OCGA § 14-5-43 ("The majority of those who adhere to its organization and doctrines represent a church . . . .").

[11] *Kim*, 254 Ga. App. at 632 (2); *see also Anderson*, 268 Ga. at 147 (1).

conveyance of the church's property and assets to GHB. Thus, in order to determine the threshold matter of whether plaintiffs had standing to bring this action, we need only examine whether the trial court was correct in finding that plaintiffs represent a majority of the church's members. And such an examination first requires us to review the church's bylaws governing membership, which we must construe according to contract principles.[12]

Here, the church's membership requirements are governed by Article I, Section A of the church's bylaws, which provides as follows:

Upon approval of the church, applicants may be received or accepted by:

1. Faith: Any person publicly confessing personal faith in the Lord Jesus Christ, giving evidence of a regenerate heart and adapting [sic] the views of faith and practice held by the church, after baptism shall be admitted into the membership of the church.

2. Statement: Those who have been baptized upon profession of faith and previously accepted into the membership of a Baptist church of like

---

[12] *See Waverly Hall Baptist Church, Inc. v. Branham*, 276 Ga. App. 818, 824 (1) (d) and (2) (625 SE2d 23) (2005) ("Georgia courts clearly have jurisdiction over those disputes involving a nonprofit corporation's board of directors as well as the disposition of church property by that board, as long as we respect the nonprofit corporation's right to determine its own membership roster and bylaws." (punctuation omitted)).

13

faith and order, but who because of loss of records or similarly unavoidable circumstances have no regular letter of dismissal, shall be received into membership.

3. Letters: Members from Baptist churches of like faith and order may be received into membership by letter of recommendation from such churches.

4. Restoration: Any member whose name has been erased from the church roll or who has been excluded from church membership, may be restored upon request upon confession of any error committed or by giving satisfactory evidence to the church of having maintained a Christian character.

With the foregoing section of the bylaws as a contextual backdrop, the trial court heard from several different witnesses, who testified that many of the plaintiffs purportedly became members of the church by approaching the front of the church during a worship service, professing their faith, and then having their request to join voted upon by the congregation in attendance.[13] In addition, the trial court also heard testimony from the defendants that only six of the plaintiffs were listed as members on the church's roll book.

---

[13] During the bench trial, six of the 34 plaintiffs testified, including Pastor Allen.

14

In the section of its July 6, 2011 order in which it analyzed whether plaintiffs constituted a majority of the church's membership, the trial court noted that (1) defendants acknowledged that three of the plaintiffs joined the church through a profession of faith,[14] (2) defendants stipulated to six of the plaintiffs' membership, (3) five of the plaintiffs were stipulated to as no longer being members, and (4) no evidence was presented regarding the status of two of the plaintiffs. The court then noted that three of the plaintiffs, all of whom were members of Pastor Allen's immediate family, claimed membership pursuant to Article I, Section A (3) of the church's bylaws via letters from a church of "like faith and order." However, the court found that the phrase "like faith and order" was ambiguous and that this ambiguity was not clarified by the evidence at trial, which conflicted as to whether the phrase meant that only letters received from another Southern Baptist church were acceptable or that letters from an Independent Baptist church would also suffice. And based on this conflict, the court concluded that resolving the ambiguity would require it to improperly delve into church ecclesiastical issues.[15] Accordingly, the court found

---

[14] Defendants deny any such acknowledgment and argue that the court misread defendants' motion for partial summary judgment.

[15] *See Kim*, 254 Ga. App. at 632 (2).

15

that it could not address the membership status of plaintiffs who claimed membership pursuant to Article I, Section A (2) or (3) of the bylaws.

The trial court then addressed the remaining 16 plaintiffs, who claimed that they had become members of the church through a profession of faith under Article I, Section A (1).[16] In doing so, the court acknowledged that pursuant to this section of the bylaws, an individual who professed his or her faith during a worship service becomes a member of the church "after baptism." The court then noted: "Therefore, upon documentation of the baptism of each such plaintiff being presented to the church clerk, he or she shall be a member pursuant to Article I, Section A (1) of the Church bylaws, if documentation thereof has not already been filed." Subsequently, the trial court concluded that the evidence showed that the plaintiffs "represent a majority of the Church membership to enable the Court to address the issue before it."

However, given that there was no evidence presented during the bench trial regarding the baptism of these remaining 16 plaintiffs, the trial court's conclusion appears to be based upon an interpretation of Article I, Section A (1), in which baptism is not a prerequisite to full membership, but is instead only a formality that

---

[16] Some of those plaintiffs also claimed to be members via Art. I, Sec. A (3).

can be demonstrated at a later time and has little to no bearing on the plaintiffs'

argument that they *currently* have standing to contest this action. We find that such

an interpretation essentially renders the church's bylaws' phrase "after baptism"[17]

meaningless.[18] Thus, the trial court erred in relying on that construction of the bylaws

---

[17] The Baptist Faith and Message, as adopted by the Southern Baptist Convention (and included in the appellate record ), describes the central role that baptism plays in the life of affiliated churches:

> Christian baptism is the immersion of a believer in water in the name of the Father, the Son, and the Holy Spirit. It is an act of obedience symbolizing the believer's faith in a crucified, buried, and risen Saviour, the believer's death to sin, the burial of the old life, and the resurrection to walk in newness of life in Christ Jesus. It is a testimony to his faith in the final resurrection of the dead. Being a church ordinance, *it is prerequisite to the privileges of church membership* and to the Lord's Supper.

"The Baptist Faith and Message," p. 14 (rev. 1998) (emphasis supplied). The most recent version of this statement of faith was adopted by the Southern Baptist Convention in 2000, and includes the identical language noted above. *See* "The Baptist Faith and Message" (rev. 2000), *available at* http://www.sbc.net/bfm/bfm2000.asp#vii.

[18] *See Waverly Hall Baptist Church, Inc.*, 276 Ga. App. at 824-25 (2) (noting that in construing church bylaws according to contract principles, courts must "give meaning to every term within the contract, rather than construe any term as meaningless").

to determine that the plaintiffs were currently members and constituted a majority of the church.[19]

Moreover, even if we agreed—based on equitable estoppel or other grounds—[20]that all of the plaintiffs were members of the church, the trial court's July 6, 2011 order makes no reference to how it determined that plaintiffs constituted a majority of the church or, indeed, what constituted the totality of the membership.[21] So, while defendants submitted some evidence—in the form of the church roll book—that the total church membership was such that even if all plaintiffs were deemed members they would not amount to a majority, we are still left to speculate as to whether the trial court found this evidence to be wholly without probative value

---

[19] *See id.* at 825 (2).

[20] We pause to express our serious reservations as to the general applicability of equitable estoppel in determining standing (or lack thereof) of those claiming membership in a church-property dispute. Suffice it to say, it is not the role of the government, or of this Court in particular, to inquire into or determine the extent to which a church has been faithful in adhering to its dictates of membership. *See Kim*, 254 Ga. App. at 632 (2) (holding that Georgia courts will not entertain controversies involving a church's "faith, teaching, doctrine, and discipline of the church such as expulsion from membership, internal procedures, quorums, or *determination of membership in the church*.") (citation and punctuation omitted) (emphasis supplied).

[21] *Cf. Howard*, 264 Ga. App. at 663 (1) (affirming trial court's attempt to first determine total membership of church in order to determine whether plaintiffs constituted a majority).

18

or whether it instead found some on the roll book to be members but not others. Indeed, given defendants' concession that some of the plaintiffs were members stemmed from their names being included in the church roll book, it would seem that the trial court considered the roll book to be at least somewhat probative. In addition, the trial court's order is rendered more confusing when it appears to dismiss the threshold question of plaintiffs' standing and its own jurisdiction by concluding that because no one in the church membership—Dial and Ballard excluded—ratified or approved the transfer, "it is unnecessary to determine whether the plaintiffs constitute a majority of the Church membership."

Accordingly, we vacate the trial court's July 6, 2011 order and because all of the other issues on appeal hinge on the threshold question of whether plaintiffs constitute a majority of the church, we also vacate, for the time being, the trial court's orders granting plaintiffs' motion for partial summary judgment and plaintiffs' motion for supersedeas bond. On remand, we direct the trial court to definitively determine whether plaintiffs are members of the church pursuant to the church's bylaws—to the extent that it can do so without engaging in a subjective analysis of ecclesiastical

matters[22]—and whether plaintiffs constitute a majority based on the church's total members so as to have standing to bring suit.[23] In doing so, we leave it to the trial court's discretion as to the procedural vehicle that can best accomplish this determination. Furthermore, if the trial court determines that plaintiffs constitute a majority of the church, it need not revisit the remainder of its July 6, 2011 order or the other two orders that gave rise to these appeals. And following the trial court's determination, the losing party may appeal the determination and any of the orders that were previously on appeal.

*Judgment vacated and case remanded with direction. Ellington, C. J., and Phipps, P. J., concur in judgment only.*

---

[22] For instance, while recognizing that our ruling here has created a difficult task for the trial court, we agree with the court's assessment that the phrase "like faith and order" was ambiguous and that, therefore, it could not address the membership status of plaintiffs who claimed membership pursuant to Article I, Section A (2) or (3) of the bylaws. *See Waverly Hall Baptist Church, Inc.*, 276 Ga. App. at 825 (2) (holding that the trial court was forbidden to engage in a subjective analysis of the meaning of the phrase "full and regular" in church bylaws when phrase was not defined in bylaws because doing so would require delving into internal church procedures).

[23] *See Howard* 264 Ga. App. at 664 (2) (holding that trial court could properly order an election process to determine which faction represented the majority of the church).