**SECOND DIVISION**
**ANDREWS, P. J.,**
**MCFADDEN and RAY, JJ.**

**NOTICE:** Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/

**November 20, 2014**

# In the Court of Appeals of Georgia

A14A1100. LEGACY ACADEMY, INC. v. JLK, INC.

RAY, Judge.

Legacy Academy, a franchisor of childcare centers, sued one of its franchisees, JLK, Inc., alleging breach of contract. The trial court granted summary judgment to Legacy,[1] reserving for trial its decision on the amount of damages due, if any. After a bench trial, the lower court entered a final judgment in favor of Legacy for $9,729 in royalty fees for the months of November and December 2010, in addition to pre- and post-judgment interest and attorney fees. Legacy appeals from the final judgment, arguing that the amount awarded is insufficient and that the trial court erred in finding that Legacy could not recover damages after December 2010, or any advertising fees

---

[1] JLK appealed, but this Court affirmed the trial court's decision in an unpublished opinion, *Legacy Academy v. JLK, Inc.*, Case No. A13A0810, 323 Ga. App. XXIII (2013).

either before or after that date. Legacy also claims the trial court erred in determining that it failed to provide sufficient proof quantifying its damages and in finding that OCGA § 51-12-13 does not apply as a basis to discount future royalty fees. We reverse the trial court's findings as to advertising fees. Further, while we find that lost future royalties may properly be an item of damages, we affirm the court's determination as to the insufficiency of proof of future royalty fee damages. We remand the case for further proceedings not inconsistent with this opinion.

> [W]hile we apply a de novo standard of review to any questions of law decided by the trial court, factual findings made after a bench trial shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of witnesses. Indeed, because the clearly-erroneous test in effect employs the same standard as the any evidence rule, appellate courts will not disturb fact findings of a trial court if there is any evidence to sustain them.

(Punctuation and footnotes omitted.) *God's Hope Builders, Inc. v. Mount Zion Baptist Church of Oxford, Ga., Inc.*, 321 Ga. App. 435, 439 (741 SE2d 185) (2013). Accord *Alday v. Decatur Consolidated Water Svcs., Inc*., 289 Ga. App. 902, 903 (1) (658 SE2d 476) (2008) ("Regardless of whether evidence supports an opposite finding, we construe the evidence in favor of the trial court's finding and affirm if there is any evidence to support it") (footnote omitted).

2

On July 22, 2002, JLK and Legacy entered into a franchise agreement that Legacy drafted. In pertinent part, the contract provided that JLK pay Legacy five percent of its gross monthly revenue as royalty fees and, under certain circumstances, one percent of its gross monthly revenue as advertising fees. The franchise agreement was to last for 20 years. Approximately 8 ½ years into the term, on December 13, 2010, JLK sent a letter to Legacy stating that JLK intended to "terminate all of their relationship with Legacy effective January 1, 2011[,]" and would remove all indicia of Legacy affiliation by that date. After the date of the letter, Legacy never communicated with, sent correspondence to, or otherwise provided assistance to JLK. JLK continued to use Legacy's name and trademarks until December 31, 2010, and after that date, continued its daycare operations at the same location under the name Old Peachtree Academy. JLK last paid its royalty and advertising fees due under the contract in October 2010, approximately two months prior to sending the letter. Legacy sued in December 2010, seeking accrued royalty and advertising fees through that time as well as future, unaccrued royalty and advertising fees through the contract's full term, July 2022. The trial court awarded only royalty fees for November and December 2010, the time period when JLK still used Legacy's name

3

and marks; it awarded no royalties pertaining to what would have been the remainder of the contract term. It also awarded no advertising fees.

1. Legacy first argues that the trial court erred in concluding that it could not recover future royalty fees. The trial court determined that the contract "did not vest the right of unilateral termination in JLK[,]" but that Legacy could not recover future royalty fees between January 2011 and July 2022 because it "admitted the termination of the contract upon filing of the complaint on December 29, 2010." The trial court reasoned that because the royalty fee was defined by the contract as consideration for JLK's use of Legacy's name and trademarks, and that there was no requirement in the contract that JLK actually exercise its right to use the Legacy Academy System and its licensed marks, then the consideration was eliminated when Legacy terminated the contract. We disagree.

On appeal, JLK argues that although its breach for failure to pay *past due* royalty fees caused Legacy's loss of those fees, its breach did not cause Legacy's loss of *future* fees. Rather, JLK argues that Legacy's decision to terminate the contract "proximately caused" its own loss of future fees because when Legacy terminated the contract, it "deprived" itself of entitlement to fees because the termination meant JLK could no longer use Legacy's trademarks. This argument ignores the language of

4

JLK's letter, which states that JLK will voluntarily stop using those marks, and the fact that JLK voluntarily ceased using the marks.

Although not directly addressed by the trial court, JLK somewhat obliquely raises the specter of a split among courts of various jurisdictions as to whether and under what analysis a franchisor may recover *future* royalties. Georgia has yet to address this issue head-on. While there appears to be general agreement that a franchisor may recover lost future royalties when a franchisee terminates the relationship, the divide occurs where, as here, the franchisor terminates the relationship.[2] See Douglas R. Hafer and Logan W. Simmons, "Lost Future Royalties: Lessons from Recent Decisions," 31 Franchise Law Journal 150, Winter 2012. See generally *Kiddie Academy Domestic Franchising LLC v. Faith Enterprises DC, LLC*, 2010 WL 673112 at *5 (II) (B) (3) (b) (D.Md. 2010). Courts considering the issue have used two different analyses: the proximate cause rationale that JLK urges and which has been applied, for example, in *Postal Instant Press, Inc. v. Sealy*, 43

---

[2] Georgia law recognizes that an anticipatory repudiation occurs when one party to a contract repudiates its obligation to perform before the contract's time of performance. In such an instance the innocent party has a choice of remedies, which include treating the repudiation as a breach. See *Kirkland v. Morris*, 233 Ga. 597, 598 (212 SE2d 781) (1975); *Piedmont Life Ins. Co. v. Bell*, 103 Ga. App. 225, 234-235 (3) (119 SE2d 63) (1961).

Cal.App.4th 1704, 1709-1713 (II) (1996); or a traditional contract analysis, as applied in *American Speedy Printing Centers, Inc. v. AM Marketing, Inc.*, 69 Fed.Appx. 692, 698 (B) (6th Cir. 2003) and as also applied by a Texas appellate court using Georgia law in *Progressive Child Care Systems, Inc. v. Kids 'R' Kids Intl., Inc*., 2008 WL 4831339, *3-*4 (IV) (Tex. Ct. App. Nov. 6, 2008).

The *Sealy* court held that a franchisee's "mere failure" to pay royalties was not a "proximate" or "natural and direct" cause of the franchisor's loss of future royalties, reasoning that the franchisor's own decision to terminate was the cause of its loss.[3] *Sealy*, supra at 1711, 1713 (II). Although not part of an express ruling, the *Sealy* court also remarked on the difficulties in accurately projecting future profits. Id at 1714 (III), n. 5.

As recognized in *Progressive Child Care Systems*, supra at *4 (IV), however, Georgia law provides a mechanism for quantifying future profits under general

---

[3] The *Sealy* decision has been roundly criticized for its abandonment of traditional contract principles, for potentially offering franchisees a way to enjoy the benefits of a franchise agreement without fully paying for those benefits, and for positing that a franchisor may eventually collect its lost "future" royalties – once they become past-due, that is – by repeatedly suing the franchisee. See 31 Franchise Law Journal, supra at 151. It is worth noting that even *Sealy* does not foreclose future royalties even in the event of the franchisor's termination so long as the franchisee's conduct proximately caused the damages. *Sealy*, supra at 1711, 1713 (II).

contract principles, and this is how we will proceed. As a threshold matter, our courts recognize that the policy behind a damages award is to place the injured party in the position it would have been in had the contract been fully performed. *Turner Broadcasting System, Inc. v. McDavid*, 303 Ga. App. 593, 612 (4) (693 SE2d 873) (2010). Even though anticipated profits may be too speculative to be recovered, in the context of an established business that has definite, certain and reasonable data for ascertaining profits, our courts have determined that such profits may be recovered, even if they cannot be shown with mathematical certainty, where the claimant can show with specificity the probable gain as well as the expenses. *KAR Printing, Inc. v. Pierce*, 276 Ga. App. 511, 511-512 (623 SE2d 704) (2005). "Damages recoverable for a breach of contract are such as arise naturally and according to the usual course of things from such breach and such as the parties contemplated, when the contract was made, as the probable result of its breach." OCGA § 13-6-2.

In the instant action, the following contract terms are relevant to our analysis: Paragraph 2.2:

> Franchisee *shall operate* its Legacy Academy Center under the assumed name of LEGACY ACADEMY CENTER[.] (Emphasis supplied.)

Paragraph 4.2:

Beginning upon commencement of operations of Franchisee's Legacy Academy Center, Franchisee shall pay to Franchisor a non-refundable monthly royalty fee equal to [five][4] percent (5%) of the Franchisee's Gross Monthly Revenue (as hereinafter defined) ("Royalty Fee"). This Royalty Fee shall be consideration for Franchisor entering into this Agreement and for Franchisee's right to use the Legacy Academy System and the Licensed Marks.

Paragraph 5.4

Franchisee further *agrees and covenants to operate the Legacy Academy Center and advertise, market and promote its Legacy Academy Center only under the Licensed Marks*; to adopt and use the Licensed Marks solely in the manner prescribed by Franchisor[.] (Emphasis supplied.)

Paragraph 8.3

Franchisee agrees to use the Premises *solely for the operation of a Legacy Academy Center* in the manner and pursuant to the standards prescribed herein. (Emphasis supplied.)

Paragraph 14.1:

*Franchisor may terminate this Agreement prior to the expiration of its term upon the occurrence of any one or more events of default* described below ("Event of Default"). Upon the occurrence of any Event of

---

[4] Although the contract actually says "four percent," the parties stipulated that the correct amount was five percent, which is what JLK paid.

Default which remains uncured . . . Franchisor may, at its option, and without waiving its rights hereunder or any other rights available at law or in equity, including its rights to damages, terminate this Agreement and all of Franchisee's rights hereunder, effective immediately upon the date Franchisor gives Franchisee written notice of termination. Each of the following events shall constitute an Event of Default; . . . (b) (ii) If *Franchisee fails to pay any financial obligation* (including applicable interest) to Franchisor within ten (10) business days after the date on which Franchisor gives written notice that such payment is delinquent. (Emphasis supplied.)

Paragraph 15.1:

*Upon the expiration or termination (for any reason) of this Agreement, Franchisee shall: . . . (b) Pay all sums owing to Franchisor* (including interest thereon). Upon termination with any *default by Franchisee*, such sums shall include *actual and consequential damages suffered* and costs and expenses (including reasonable attorneys' fees) incurred, by Franchisor as a result of the Event of Default and the termination. (Emphasis supplied.)

Contrary to the trial court's ruling, the contract at Paragraphs 2.2 and 5.4 requires JLK to operate as a Legacy Academy with concomitant use of Legacy's trademarks. Paragraph 8.3 requires that JLK operate its premises only as a Legacy Academy Center, rather than under the other name it chose after sending its purported

9

termination letter. Paragraphs 14.1 and 15.1 clearly provide that if JLK defaults, as it did, through, inter alia, nonpayment, Legacy may terminate the agreement, and a termination "with any default by Franchisee" gives Legacy the right to "actual and consequential damages suffered."

On appeal, it is undisputed that JLK, as this Court affirmed in *Legacy Academy*, supra, breached the contract. That breach prompted Legacy's termination of the contract. The contract contemplated both Legacy's receipt of the five percent of gross revenue royalty fee and damages upon JLK's default by, inter alia, its failure to pay that fee. We find that Legacy was entitled to seek recovery of lost future royalties that it would have received if JLK's breach had not prompted its termination of the franchise agreement prior to the completion of its original 20-year term. The trial court erred in determining that Legacy could not recover because it was the party that terminated the contract, and we reverse.

2. Actual recovery of those royalties, however, turns on whether Legacy made the required showing as to its lost profits. The trial court determined that Legacy presented insufficient evidence of future damages from lost royalty fees. We are constrained to agree.

The trial court determined that "the measure of Legacy's damages is lost net profits, not gross revenue." The trial court went on to find that Legacy presented evidence only as to lost gross revenue between January 2011 and July 2022, and that it did not present sufficient evidence of expenses and avoided costs such that lost profits from royalties could be calculated with sufficient specificity.[5]

> Ordinarily, anticipated profits are too speculative to be recovered, but where the business has been established, has made profits and there are definite, certain and reasonable data for their ascertainment, and such profits were in the contemplation of the parties at the time of the contract, they may be recovered even though they can not be computed with exact mathematical certainty. Nonetheless, to recover lost profits one must show the probable gain with great specificity as well as expenses incurred in realizing such profits. In short, the gross amount minus expenses equals the amount of recovery.

(Citation and punctuation omitted.) *KAR Printing, Inc.*, supra at 511-512.

In the instant case, Melissa Turner, Legacy's chief financial officer and vice president, testified that her company would reap cost savings as a consequence of no longer providing services and support to JLK. She testified that Legacy's franchise

---

[5] It is worth noting that in a quantification of damages by lost profits, the lower a franchisor's expenses, the higher its profits and, thus, the higher the amount of damages it stands to recover assuming the proper proof is present.

11

expenses for JLK were "pretty minimal[.]" Legacy provided at least two quality-assurance visits per year, which Turner estimated cost about $150 per day in employee time, although she stated the employee would be paid a flat salary regardless of whether a JLK visit took place; she also testified that Legacy provided website services that cost $39 per month per franchisee. Other than this, she provided no specifics or data as to the savings associated with other JLK-related expenses, which she testified included training, meetings, curriculum updates, other corporate services, and conferences. She stated that those services would be offered to other franchisees whether JLK was "a part of what we do or not. It's just very minimal, the things that I would be able to save." Turner also testified that some portion of the royalties Legacy collected were used to pay overhead and general administrative expenses, but said that she did not break down those expenses for individual franchisees. While testifying that although JLK "signed a contract to be part of the franchise and I still have those costs associated with the franchise," Turner agreed that she had "done nothing to specifically quantify those numbers[.]"

JLK presented evidence in the form of Legacy's audited financial reports from 2010-2011 showing that Legacy's general and administrative expenses, which included accounting, insurance, office expenses, and professional services, declined

12

by approximately $166,704, from $576,837 to $410,133. Turner testified that this reduction in expenses occurred when Legacy saw a reduction in the number of its franchisees. There was no testimony as to how many franchisees were no longer associated with Legacy during this time period.

Here, although Turner provided some specific testimonial evidence as to web costs, she provided no evidence as to the other, albeit reportedly "minimal" expenses. To sufficiently quantify lost profits, a finder of fact "must be provided with figures establishing the business's projected revenue as well as its projected expenses." (Citations omitted.) *Pounds v. Hosp. Auth. of Gwinnett County*, 197 Ga. App. 598, 599 (1) (399 SE2d 92) (1990). Cf. *Crosby v. Spencer*, 207 Ga. App. 487, 488 (1) (428 SE2d 607) (1993) (plaintiff "gave extensive testimony regarding his computation of lost profits . . . based on his calculation of net profits realized").

Legacy cites *Bennett v. Smith*, 245 Ga. 725, 726 (267 SE2d 19) (1980), contending that where a business has expenses that "remain[ed] essentially the same" even when the business is not producing, a factfinder may award lost revenue as opposed to lost profit. Legacy misses a crucial distinguishing element of *Bennett*, however. *Bennett* stands for the proposition that unestablished businesses with no revenue and expense history may be able to recover lost revenue instead of lost

13

profits if the amount of their expenses, or lack thereof, are established by reference to subsequent, documented business operations.[6] Id. In the instant case, Legacy is neither a new business with no history of revenue and expenses, nor has it pointed us to data of actual subsequent, documented business operations and expenses.

Here, we have only Turner's testimony that, other than web fees and costs of inspection, there are other "minimal" yet unquantified expenses. This is insufficient. See *Tri-State Systems, Inc. v. Village Outlet Stores, Inc.*, 135 Ga. App. 81, 84 (2) (217 SE2d 399) (1975) (a "bold assertion" by a business owner as to the amount of lost profits has no evidentiary value "in the absence of any records or statements reflecting the store's previous and present profits or losses"). While it is true that "the rule that lost profits cannot be speculative or uncertain relates more especially to the uncertainty as to cause, rather than uncertainty as to the measure or extent of the damages[,]" this pertains only when "the amount of the recovery comes within that authorized with *reasonable certainty* by the legal evidence submitted." (Citation and

---

[6] In *Bennett*, the issue ultimately would have been left for a jury's determination: the case came to the Court of Appeals on appeal from the trial court's grant of a directed verdict to the defendant. The Supreme Court found that plaintiffs' actual evidence that their expenditures were the same both before and after the breach was sufficient to authorize a jury award of lost revenues as damages. *Bennett*, supra at 726.

14

punctuation omitted; emphasis supplied.) *McMillian v. McMillian*, 310 Ga. App. 735, 739-740 (713 SE2d 920) (2011). Here, such reasonable certainty arguably is lacking; pertinently, our standard of review requires that we affirm the trial court's factual findings if there is any evidence to support them, and here, there is such evidence. *God's Hope Builders, Inc.*, supra at 439; *Alday*, supra at 903 (1).

3. Legacy also argues that the trial court erred in disallowing its claim for advertising fees in toto, that is, from November 2010 to July 2022. The franchise agreement provides that franchisees pay one percent of their gross monthly revenue to Legacy as an advertising fee. At trial, Turner testified that 100 percent of the advertising dollars that Legacy collects are used for advertising and marketing expenses, and that not having JLK's 1 percent reduced Legacy's ability to advertise. The trial court found that Legacy could not recover advertising fees because it derives no profit from them. This is error.

The advertising fees require a different analysis than the royalty fees. The advertising fee had as its consideration only the provision of advertising itself, and the contract requires Legacy "to expend all, or any portion, of the Fund, in any year, for advertising, marketing or promotional programs or activities[.]" The contract at Paragraph 9.1 specifically states that

15

Franchisee understands and acknowledges that the Fund is intended to maximize general public recognition and acceptance of the Licensed Marks for the benefit of the Legacy Academy System, as a whole, and that Franchisor or its designee undertake no obligation in administering the Fund to insure that any particular franchise owner benefits directly or pro rata from amounts contributed by such franchisee to the Fund.

Thus, the purpose and expectation of the advertising fee was not an immediate profit to Legacy, but rather an overall enhancement of the Legacy brand per se. When, as here, a contract is breached,

the best measure of the value of the broken promise is the value assigned to it by the parties themselves. . . . [B]asing damages on an amount equal to what the promisor and, especially, the promisee, believed the promise to be worth, reflects better than any other measure the loss caused by the breach[.] . . . [D]amages based on protection of the promisee's expectation interest are not only the most accurate means of measuring loss following a breach of contract but also the most typical measure of recovery granted.

24 Williston on Contracts, § 64.2 (4th ed., 2014).

"We recognize that damages for breach of contract claims are compensatory awards designed to give the injured party the benefit of his bargain." (Citation omitted.) *Turner Broadcasting System, Inc.*, supra at 611 (4). The calculation of

damages should be flexible so as to reasonably compensate the injured party and place that party in the position he or she would have been in if the contract had been performed. Id. at 612 (4). Legacy was entitled to receive the benefit of the bargain it made as to the advertising fees. We therefore reverse the trial court's denial of Legacy's claim for advertising fees both before and after the contract's termination, and remand the case for proceedings not inconsistent with this opinion.

4. Finally, Legacy posits that the trial court erroneously determined that OCGA § 51-12-13 is inapplicable here. Because the trial court ruled on this matter only in the context of future royalty fees, given our determination in Division 2, we need not reach this enumeration of error. However, we note that Legacy's argument that the trial court erred when it found that OCGA § 51-12-13 applies only in the context of torts, not contracts, may have merit.[7]

---

[7] The trial court cited *Chouinard v. City of East Point*, 237 Ga. App. 266, 270 (5) (b) (514 SE2d 220) (1999) for the proposition that OCGA § 51-12-13 applies only in the torts context. However, *Chouinard* is distinguishable in that it involves a jury instruction in a condemnation action. Also, the *Chouinard* court could have reached the same conclusion by recognizing that the statute merely permits, but does not require, application of a 5 percent discount rate; thus, the statute does not foreclose proof of another applicable discount rate. See OCGA § 1-1-7; *M.A.R.T.A. v. McCain*, 135 Ga. App. 460, 461 (218 SE2d 122) (1975) (statute's title or heading neither determines meaning of language nor controls legislature's intent as expressed in statute's text).

*Judgment affirmed in part, reversed in part, and case remanded with direction.*

*Andrews, P. J., and McFadden, J., concur.*