**SECOND DIVISION
BARNES, P. J.,
BOGGS and RICKMAN, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules**

**June 9, 2016**

# In the Court of Appeals of Georgia

A16A0174, A16A0175. LEGACY ACADEMY, INC. et al. v. DOLES-SMITH ENTERPRISES, INC. et al.; and vice versa.

BARNES, Presiding Judge.

These companion appeals from a jury verdict arise out of a dispute between a franchisor of daycare businesses and its franchisee. The franchisor was Legacy Academy, Inc., ("Legacy") owned by Melissa and Franklin Turner (collectively, the "Legacy Parties"). The franchisee was originally GMI Smith, LLC, and later Doles-Smith Enterprises, Inc., both of which were owned by Michele Doles-Smith and Gary Smith (collectively, the "DSE Parties"). Alleging that false and misleading information had been provided to them when they entered into the franchise agreement, the DSE Parties sued the Legacy Parties and asserted multiple claims, including claims for negligent misrepresentation and negligence under OCGA § 51-1-6 for the breach of duties imposed by federal franchise regulations. The Legacy

Parties answered, denying liability, and Legacy asserted counterclaims for lost royalties, lost advertising fees, and attorney fees.

Following a trial, the jury returned a verdict in favor of the DSE Parties on their claims for negligent misrepresentation and negligence and in favor of Legacy on its counterclaims for lost royalties and lost advertising fees. The jury returned a verdict in favor of the DSE Parties on Legacy's counterclaim for attorney fees. The parties now appeal from the final judgment entered on the jury verdict, challenging the trial court's rulings on their motions for directed verdict and judgment notwithstanding the verdict ("j. n. o. v.") made during the course of the proceedings.

In Case No. A16A0174, the Legacy Parties contend that the trial court erred in denying their motions for directed verdict and j. n. o. v. on the DSE Parties' claims for negligent misrepresentation and negligence under OCGA § 51-1-6. Additionally, Legacy contends that the trial court erred in denying its motion for directed verdict on its counterclaim for attorney fees. As explained below, because the DSE Parties failed to prove that they suffered any out-of-pocket economic damages as a result of the alleged misrepresentations, the trial court erred in denying the Legacy Parties' motions for directed verdict and j. n. o. v. on the DSE Parties' claims for negligent

2

misrepresentation and negligence. In contrast, the trial court committed no error in denying Legacy's motion for directed verdict on its counterclaim for attorney fees.

In Case No. A16A0175, the DSE Parties cross-appeal from the judgment, contending that the trial court erred in denying their motions for directed verdict and j. n. o. v. on Legacy's counterclaims for lost royalties and lost advertising fees. For the reasons discussed below, the trial court committed no error in denying the DSE Parties' motions for directed verdict and j. n. o. v. on these counterclaims.

"On appeal from the denial of a motion for a directed verdict or for j. n. o. v., we construe the evidence in the light most favorable to the party opposing the motion, and the standard of review is whether there is any evidence to support the jury's verdict." (Citation and punctuation omitted.) *Redmon v. Daniel*, 335 Ga. App. 159, 160 (779 SE2d 778) (2015). So viewed, the evidence shows that in 2006, the Smiths spoke with several potential franchisors, including Legacy, about purchasing a daycare center franchise to operate in South Fulton County. As part of those discussions, the Turners, who owned and operated Legacy, provided the Smiths with a Franchise Offering Circular (the "Offering Circular") for prospective Legacy daycare franchisees in September 2006. Among other things, the Offering Circular contained disclosures about the litigation history of Legacy and a "Three Year Pro-

3

Forma Statement of Cash Flows" that included projections of potential gross revenues and net profits for a Legacy daycare franchise in its first three years of operation.

After reviewing the Offering Circular, the Smiths decided to purchase a Legacy daycare franchise and formed GMI Smith, LLC ("GMI") for that purpose. On November 6, 2006, GMI entered into a franchise agreement with Legacy that incorporated the representations made in the Offering Circular. Under the terms of the franchise agreement, GMI paid an initial franchise fee of $40,000 to Legacy. GMI also agreed to pay Legacy five percent of its gross monthly revenue as royalty fees and one percent of its gross monthly revenue as advertising fees over the term of the franchise agreement, which was 25 years with the possibility of renewal. Pursuant to the franchise agreement, the Smiths personally guaranteed the prompt payment and performance of GMI's financial obligations to Legacy.

There were no existing Legacy daycare franchises in Fulton County, and the franchise agreement provided that the construction and development of GMI's daycare center would be performed by Legacy's affiliate owned by Mr. Turner, Commercial Contractors Enterprises, Inc. To that end, GMI agreed to pay $2,650,000 to Commercial Contractors for the purchase of the land for the daycare center and its construction and furnishing with equipment. The construction agreement was

4

financed with two bank loans. The Smiths also incurred an additional $200,000 in personal loan obligations on their home and other family property to pay the interest on the two bank loans until the daycare center became operational.

The daycare center opened for business in June 2008. By that time, the franchise agreement had been amended to substitute a second company formed by the Smiths, Doles-Smith Enterprises, Inc. ("DSE"), as the franchisee. GMI continued to own the land where the daycare center was located, while DSE took over the operations of the daycare business. DSE struggled financially in its daycare operations and suffered net losses in 2009, 2010, and 2011. As a result of its financial troubles, DSE stopped paying Legacy monthly royalties and advertising fees after March 2011.

In late 2011 and early 2012, the Smiths learned of problems between Legacy and its other franchisees and became concerned that the Offering Circular had contained inaccurate information. Ultimately, in August 2012, DSE sent a letter to Legacy stating that DSE was terminating the parties' franchise relationship upon discovering false and misleading information in the Offering Circular. DSE removed all indicia of Legacy affiliation from the daycare center and continued its daycare

operations under a different name. After terminating its relationship with Legacy and changing its director and curriculum, DSE made a net profit in 2012.

Contending that false information had been provided to them when they entered into the franchise agreement, the DSE Parties filed this lawsuit against the Legacy Parties.[1] In their complaint, as amended, the DSE Parties alleged that the representations in the Offering Circular about Legacy's litigation history and the projected cash flow of its franchises were materially false and misleading and violated the Federal Trade Commission's "Disclosure Requirements and Prohibitions Concerning Franchising and Business Opportunity Ventures Rule," 16 C. F. R. § 436.1 et seq. (the "FTC Franchise Rule"), which had been in effect when the franchise agreement was signed in November 2006.[2] Based on the alleged misrepresentations in the Offering Circular, the DSE Parties asserted, among other things, claims for negligent misrepresentation and for negligence under OCGA § 51-1-6 for the breach of duties imposed by the FTC Franchise Rule. The DSE Parties also asserted a claim for rescission but later withdrew it.

---

[1] Commercial Contractors also was a defendant and a counterclaim-plaintiff in this case, but it is not a party to these appeals.

[2] The FTC Franchise Rule was amended in 2007. See 72 F. R. 15544, March 30, 2007.

The Legacy Parties answered, denying liability for any alleged misrepresentations. Additionally, Legacy asserted counterclaims against DSE and the Smiths for breach of the franchise agreement, seeking recovery of lost royalties and advertising fees, and for attorney fees.

A jury trial was conducted on the parties' claims and counterclaims over several days in February 2015. After hearing all of the evidence, the jury found in favor of the DSE Parties on their claims for negligent misrepresentation (awarding $350,000 in damages) and negligence under OCGA § 51-1-6 (awarding $40,000 in damages). The jury found in favor of Legacy on its breach-of-contract counterclaim for lost royalties and lost advertising fees (awarding $46,300 in damages). The jury declined to award attorney fees to Legacy. The trial court entered final judgment on the jury's verdict, resulting in these appeals in which the parties challenge the trial court's denial of their motions for directed verdict and j. n. o. v. on their various claims and counterclaims.

*Case No. A16A0174*

1. The Legacy Parties contend that the trial court erred in denying their motions for directed verdict and j. n. o. v. on the DSE Parties' negligent misrepresentation claim because the DSE Parties failed to prove any out-of-pocket economic damages

7

proximately resulting from the alleged misrepresentations contained in the Offering Circular. We agree.

Proof of "actual economic loss proximately resulting from the defendants' negligent misrepresentation" is an essential element of a negligent misrepresentation claim. (Citation and punctuation omitted.) *Newitt v. First Union Nat. Bank*, 270 Ga. App. 538, 547 (5) (607 SE2d 188) (2004). Thus, absent evidence that the plaintiff suffered actual economic damage as a proximate result of the alleged misrepresentation, the claim fails as a matter of law. Id.

The Restatement (Second) of Torts § 552B addresses economic damages for negligent misrepresentation and adopts an out-of-pocket standard of recovery:

> The damages recoverable for a negligent misrepresentation are those necessary to compensate the plaintiff for the pecuniary loss to him of which the misrepresentation is a legal cause, including (a) The difference between the value of what he has received in the transaction and its purchase price or other value given for it; and (b) Pecuniary loss suffered otherwise as a consequence of the plaintiff's reliance upon the representation.

Subsection (a) of Restatement § 552B provides an out-of-pocket measure of direct damages, while subsection (b) allows for additional consequential damages proven

8

by the plaintiff. See *Atlando Holdings, LLC v. BDO Seidman, LLP*, 290 Ga. App. 665, 666 (660 SE2d 463) (2008).

Our Supreme Court has adopted Restatement § 552B as the proper measure of economic damages in negligent misrepresentation cases. See *BDO Seidman, LLP v. Mindis Acquisition Corp.*, 276 Ga. 311, 311-312 (1) (578 SE2d 400) (2003). As the Supreme Court noted in *BDO Seidman*, "[t]he out-of-pocket measure of damages is consistent with Georgia's general measure of damages in negligence cases, which seeks to place the injured party in the same place it would have been had there been no injury or breach of duty." Id. at 312.

Notably, as they concede on appeal, the DSE Parties did not introduce any evidence at trial, expert or otherwise, of the difference between the purchase price that they paid for the Legacy franchise and the value of the franchise actually sold to them in light of the alleged misrepresentations in the Offering Circular.[3] In other

_____

[3] We note that the DSE Parties could not base their damages simply on the difference between the net-profit projections for a generic Legacy franchise in its first three years of operation that were contained in the Offering Circular and what DSE actually earned during that time period. Awarding damages on that basis would have essentially converted what was a projection of potential cash flow into a guarantee of future cash flow, even though Legacy expressly disclaimed in the franchise agreement that it was making "any representation, warranty or guarantee, express or implied, as to the potential volume, profit, income or success of the business licensed under this [a]greement." Furthermore, an award of damages based on the difference

9

words, the DSE Parties presented no evidence of any out-of-pocket direct damages resulting from the Legacy Parties' alleged misrepresentations (i.e., damages under subsection (a) of Restatement § 552B). Instead, they sought only to prove consequential damages proximately resulting from the alleged misrepresentations (i.e., damages under subsection (b) of Restatement § 552B).

On appeal, the DSE Parties argue that the following evidence established their consequential damages under subsection (b) of Restatement § 552B: (a) testimony that the Smiths paid the initial $40,000 franchise fee to Legacy and incurred $200,000 in personal debt obligations to pay the interest on GMI's two bank loans until the daycare center became operational; (b) testimony that the Smiths lost their life savings in keeping the daycare center operational; and (c) testimony that the Smiths paid $48,000 for a second bus for the daycare center and that Mrs. Doles-Smith gave up more lucrative employment to manage the daycare business. We will address these categories of alleged consequential damages each in turn.

(a) At trial, Mr. Smith testified that the Smiths paid the $40,000 franchise fee to Legacy when they signed the franchise agreement on behalf of GMI. Mr. Smith

_____

between the value of projected earnings and subsequent actual earnings clearly would not be a recovery under the out-of-pocket standard of recovery as defined in subsection (a) of Restatement § 552B.

10

also testified that the Smiths took out $200,000 in personal loans on their home and other family property to pay the interest on the two bank loans for the purchase transaction until the daycare center was open for business. The $40,000 franchise fee and $200,000 in personal debt obligations, however, were not recoverable as consequential damages for the alleged negligent misrepresentations contained in the Offering Circular.

Consequential damages are defined as "[l]osses that do not flow directly and immediately from the injurious act but that result indirectly from the act." Black's Law Dictionary (10th ed. 2014). See OCGA § 51-12-3 (distinguishing direct from consequential tort damages). Thus, "[c]onsequential damages are losses 'not inherent in the nature of the transaction.'" *Standard Chartered PLC v. Price Waterhouse*, 945 P2d 317, 347 (Ariz. Ct. App. 1996), quoting Restatement (Second) of Torts § 549 cmt. a.[4] Rather, consequential damages are additional expenditures incurred by a plaintiff in reliance on a misrepresentation that otherwise would not have been

_____

[4]Comments a to f of Restatement § 549 are applicable, where relevant, to Restatement § 552B. See Restatement 552B cmt. a ("The rule stated in this Section applies, as the measure of damages for negligent misrepresentation, the rule of out-of-pocket loss that is stated as to fraudulent misrepresentations in Subsection (1) of § 549. Comments a to f under § 549 are therefore applicable to this Section, so far as they are pertinent.").

incurred as part of the underlying transaction. See id.; *Clearview Concrete Products Corp. v. S. Charles Gherardi, Inc.*, 88 AD2d 461, 468 (N.Y. App. Div. 1982).

Here, in seeking to recover the $40,000 franchise fee and $200,000 in personal debt obligations, the DSE Parties were attempting to recover part of the purchase price that they paid for the Legacy daycare franchise and part of the costs of funding the purchase transaction. But the purchase price and costs of funding the purchase were expenditures inherent in the underlying purchase transaction rather than additional, indirect expenditures incurred as a consequence of the alleged misrepresentations in the Offering Circular. Accordingly, the $40,000 franchise fee and $200,000 in personal debt obligations were not recoverable as consequential damages as a matter of law. See *Standard Chartered PLC*, 945 P2d at 347-348 (costs of funding the underlying purchase were not consequential damages that were recoverable as part of a negligent misrepresentation claim).

Indeed, awarding consequential damages in the amount of the purchase price and other costs inherent in the underlying purchase of a franchise "would be tantamount to putting [a franchisee] into the position [it] would be in if the transaction with [the franchisor] had never taken place." *Massey, Inc. v. Moe's Southwest Grill, LLC*, No. 1:07-CV-0741-RWS, 2015 WL 438513, at \*22 (N.D. Ga.

12

Feb. 3, 2015). Restoring the parties to their original status, including return of the purchase price, is the goal of rescission. See *Eller v. McMillan*, 174 Ga. 729, 732 (163 SE 910) (1932) ("When a contract is rescinded, the parties are not to be left where the rescission finds them. The original status must be restored, or an equivalent therefor must be provided in the contract or furnished by the law."); *Mitchell v. Backus Cadillac-Pontiac, Inc.*, 274 Ga. App. 330, 334 (1) (b) (618 SE2d 87) (2005) ("If a purchaser has promptly restored the subject of the contract to the seller, or offered to do so, his action is one for rescission at law and he is entitled to recover as restitution the purchase price actually paid by him.").

However, the DSE Parties withdrew their claim for rescission, and they cannot now pursue a remedy in the nature of a rescission of that agreement through the guise of consequential damages. See *Massey, Inc.,* 2015 WL 438513, at *22 (damages for lost investment could not be recovered for alleged misrepresentation by franchisor, where franchisee had not properly rescinded the franchise agreement, and awarding those damages to franchisee would in essence be a rescission). The $40,000 franchise fee and $200,000 in personal debt obligations therefore do not represent consequential damages and could not support the jury's award of damages on the DSE Parties' negligent misrepresentation claim.

13

(b) Mr. Smith testified that the Smiths "depleted [their] savings" and liquidated their stock and retirement accounts to pay for operational losses sustained by the daycare center over the years. Mr. Smith was unable to specify in any greater detail the amount of savings lost, and the DSE Parties did not offer any evidence further demonstrating how the loss of the Smiths' savings was tied to the alleged misrepresentations in the Offering Circular.

"Where a party sues for damages, he has the burden of proof of showing the amount of loss in a manner in which the jury . . . can calculate the amount of the loss with a reasonable degree of certainty." (Citation and punctuation omitted.) *Tucker Nursing Center v. Mosby*, 303 Ga. App. 80, 82 (1) (692 SE2d 727) (2010). Damages cannot be left to "speculation, conjecture, and guesswork." (Citations and punctuation omitted.) *Hospital Auth. of Charlton County v. Bryant*, 157 Ga. App. 330, 331 (2) (277 SE2d 322) (1981). Mr. Smith's testimony regarding the loss of the Smiths' savings was simply too vague and would have required the jury to resort to speculation and guesswork in awarding damages. His testimony thus did not provide a basis for the recovery of consequential damages in this case.

(c) Mr. Smith testified that the Smiths paid $48,000 for a second bus for the daycare center and that Mrs. Doles-Smith gave up outside employment in which she

made approximately $60,000 in salary in 2006 and approximately $100,000 in salary in 2007 to work at the daycare for a minimal salary. But the DSE Parties presented no evidence that the $48,000 bus expense or Mrs. Doles-Smith's lost salary were a consequence of the Smiths' reliance on the alleged misrepresentations in the Offering Circular. Rather, Mr. Smith testified that the Smiths paid $48,000 for a second bus because the Smiths had committed the daycare center to providing before- and after-school pickup of children at several elementary schools, and Legacy would not provide funds to purchase a second bus. Mr. Smith further testified that Mrs. Doles-Smith left her prior lucrative jobs to work at the daycare because the Smiths believed that Legacy required at least one of the franchisee owners to work on-site and because working at a daycare center was Mrs. Smith's "dream" job. This testimony makes clear that neither the bus expense nor lost salary proximately resulted from the alleged misrepresentations in the Offering Circular and thus could not be recovered as consequential damages under subsection (b) of Restatement § 552B.

The DSE Parties argue, however, that the jury could have found that the Legacy Parties misrepresented the number of buses the franchise would receive and misrepresented that one of the franchise owners would have to work at the franchise location, and that these separate negligent misrepresentations, apart from the Offering

15

Circular, could have provided an alternative basis for the jury to award damages based on the bus expense and lost salary. We are unpersuaded.

The DSE Parties' complaint as amended did not base the negligent misrepresentation claim on any alleged misrepresentations regarding the number of daycare center buses or a franchisee work requirement. While pleadings may be deemed amended to conform to the evidence presented at trial, see OCGA § 9-11-15 (b), the evidence did not support an award of damages predicated on the DSE Parties' alternative theory of negligent misrepresentation.

The Offering Circular expressly stated that franchisees might incur between $1,500 and $80,000 in expenses for "vehicles" and were "not required to participate personally in the direct operation of [their] Legacy Academy for Children Development Center." And the franchise agreement, which incorporated the representations in the Offering Circular, contained an "Entire Agreement" clause:

> Franchisees acknowledge that this agreement and the other documents and agreements contemplated herein, constitute the entire agreement of the parties with respect to the matters contained herein. This Agreement terminates and supersedes any prior agreement between the parties concerning the same subject matter.

"An entire agreement clause operates as a disclaimer, establishing that the written agreement completely and comprehensively represents all the parties' agreement," and thus purchasers like the DSE Parties are "barred from claiming that [they] relied on an alleged misrepresentation not contained within the agreement." (Citation and punctuation omitted.) *Savage v. KGE Assoc. Ltd. Partnership*, 260 Ga. App. 770, 776 (2) (a) (580 SE2d 591) (2003). Hence, the DSE Parties could not show that they reasonably relied on any alleged misrepresentation that they would receive a second bus from Legacy or that Mrs. Doles-Smith had to work at the franchise location, and could not recover any damages predicated on those misrepresentations.

For these combined reasons, the DSE Parties failed to prove that they sustained any economic damages, direct or consequential, based on the alleged negligent misrepresentations made by the Legacy Parties. The trial court therefore erred in denying the Legacy Parties' motions for directed verdict and j. n. o. v. on the DSE Parties' negligent misrepresentation claim.

2. The Legacy Parties also contend that the trial court erred in denying their motions for directed verdict and j. n. o. v. on the DSE Parties' negligence claim under OCGA § 51-1-6 for the violation of duties imposed by the FTC Franchise Rule because the DSE Parties failed to prove any economic damages. The DSE Parties

17

concede that the measure of damages for their negligence claim under OCGA § 51-1-6 is the same standard applicable to their negligent misrepresentation claim. Consequently, for the same reasons discussed supra in Division 1, the DSE Parties failed as a matter of law to establish any economic damages to support their claim for negligence under OCGA § 51-1-6, and thus the trial court should have granted the Legacy Parties' motions for directed verdict and j. n. o. v. on this claim as well.[5]

3. Legacy contends that the trial court erred in denying its motion for directed verdict on its counterclaim for contractual attorney fees against DSE and the Smiths. According to Legacy, the franchise agreement entitled it to reasonable attorney fees in collecting unpaid royalties and advertising fees from DSE and the Smiths, and Legacy's two attorneys stated in their place at trial that their fees were $12,500 and $19,670, respectively. Based on its counsel's statements, Legacy maintains that the trial court should have directed a verdict in its favor on its attorney fees counterclaim in the amount of $32,170 ($12,500 + $19,670). We do not agree.

---

[5]Given our conclusion in Divisions 1 and 2 that the DSE Parties could not succeed on their claims for negligent misrepresentation and negligence under OCGA § 51-1-6 based on their failure to prove economic damages, we need not address the Legacy Parties' alternative argument that these claims were barred by the applicable statute of limitation.

18

The determination of the reasonableness and value of attorney fees is for the trier of fact. See *SKB Indus. v. Insite*, 250 Ga. App. 574, 579 (5) (551 SE2d 380) (2001); *Tab Sales v. D & D Distrib.*, 153 Ga. App. 779, 780 (2) (266 SE2d 558) (1980). And the trier of fact is not bound to the opinion of an attorney regarding the reasonableness and value of his own fees. See *Medical Office Mgmt. v. Hardee*, 303 Ga. App. 60, 67 (2) (b) (693 SE2d 103) (2010). It follows that the trial court committed no error in declining to direct a verdict in the amount of $32,170 on Legacy's counterclaim against DSE and the Smiths for contractual attorney fees.

*Case No. A16A0175*

4. The DSE Parties contend that the trial court erred in denying their motions for directed verdict and j. n. o. v. on Legacy's breach-of-contract counterclaim seeking to recover lost royalties.[6] According to the DSE Parties, Legacy failed to come forward with sufficient evidence of its lost profits from royalties to allow the jury to calculate damages without resorting to speculation and guesswork. We disagree.

---

[6] Legacy sought lost royalties through December 2014 rather than for the entire remaining portion of the 25-year term of the franchise agreement.

19

A franchisor's claim for lost royalties is treated in the same manner as a claim for lost profits. *Legacy Academy v. JLK, Inc.*, 330 Ga. App. 397, 402 (2) (765 SE2d 472) (2014). The rule for recovery of lost profits is well-established:

> Ordinarily, anticipated profits are too speculative to be recovered, but where the business has been established, has made profits and there are definite, certain and reasonable data for their ascertainment, and such profits were in the contemplation of the parties at the time of the contract, they may be recovered even though they can not be computed with exact mathematical certainty. Nonetheless, to recover lost profits one must show the probable gain with great specificity as well as expenses incurred in realizing such profits. In short, the gross amount minus expenses equals the amount of recovery.

(Citation, footnote, and punctuation omitted.) *KAR Printing v. Pierce*, 276 Ga. App. 511, 511-512 (623 SE2d 704) (2005).

On appeal, the DSE Parties do not dispute that Legacy presented sufficient evidence of its lost gross revenue resulting from the unpaid royalty fees through December 2014.[7] The DSE Parties instead contend that Legacy failed to come forward with sufficient evidence of its expenses and avoided costs to allow the jury to calculate lost profits from royalties with sufficient specificity.

---

[7]As previously noted, the franchise agreement required franchisees to pay Legacy five percent of their gross monthly revenue as royalty fees.

20

We are unpersuaded.

At trial, Legacy's owners, the Turners, testified that Legacy saved no expenses other than a $49 per month web hosting fee and $35 per month in gasoline reimbursement once DSE stopped operating as a Legacy daycare franchise. Mrs. Turner explained that Legacy's other expenses remained fixed even after DSE terminated its franchise because Legacy still paid the same salaried staff at its central office to support its franchises, still paid for the same group meetings with its franchisees, and still paid to develop and market its "product" even if one of its franchises ceased operations. Mrs. Turner also explained that with respect to a particular franchise, almost all of Legacy's expenses are "front loaded" and are incurred when the franchise first becomes operational because at that point Legacy provides the franchisee with its "complete package of how to do business as a childcare center" that the franchisee then implements.

Our standard of review requires us "to construe the evidence with every inference and presumption in favor of upholding the verdict, even where the evidence is in conflict," and "so long as there is some evidence to support the jury's verdict, it must be upheld on appeal." *Turnage v. Kasper*, 307 Ga. App. 172, 178-179 (1) (704 SE2d 842) (2010). Applying that standard, we conclude that the Turners' testimony

21

provided at least some evidence of avoided costs and expenses and authorized the jury, as the trier of fact, to calculate the amount of lost profits from royalties with reasonable certainty.

It is true, as the DSE Parties emphasize, that the jury heard essentially the same evidence as to lost royalties that the trial court did in *JLK*, where we upheld the trial court's decision not to award future lost royalties to Legacy in a case involving the same contractual royalty fees provision at issue here. 330 Ga. App. at 402-405 (2). While *JLK* involved a similar dispute between Legacy and one of its franchisees over lost royalties, *JLK* is clearly distinguishable from the present case in light of its procedural posture. The trial court in *JLK* conducted a bench trial and the court, sitting as the trier of fact, determined that Legacy had failed to sufficiently prove its lost profits from royalties. Id. at 397-398. Thus, the issue on appeal in *JLK* was whether the trial court's factual finding as to damages should be affirmed or whether, as Legacy argued, Legacy had established its lost profits for unpaid royalties as a matter of law. In affirming the trial court, we concluded that Legacy "arguably" had failed to prove its lost profits from royalties with reasonable certainty and that, based on the standard of review following a bench trial, there was some evidence to support the trial court's damages determination. Id. at 405 (2).

Given its different procedural posture, *JLK* does not affect the outcome here, where the jury, as the trier of fact, reached a different factual determination regarding damages for lost royalties that was supported by some evidence in the record, a determination that we must accord proper deference. The trial court therefore committed no error in denying the DSE Parties' motions for directed verdict and j. n. o. v. on Legacy's counterclaim for lost royalty fees.

5. The DSE Parties also contend that the trial court erred in denying their motions for directed verdict and j. n. o. v. on Legacy's breach-of-contract counterclaim seeking to recover lost advertising fees.[8] Again, we are unpersuaded.

The franchise agreement provided that franchisees must pay one percent of their gross monthly revenue to Legacy as an advertising fee. At trial, Mrs. Turner testified that the advertising fee paid by its franchisees is used for "general advertising" of the Legacy brand rather than "school-specific advertising." She further testified that 100 percent of the advertising fees that Legacy collects are used for advertising and marketing expenses and that Legacy derives no profit from the advertising fees.

---

[8] As with the royalty fees, Legacy sought payment of lost advertising fees through December 2014.

On appeal, the DSE Parties argue that Legacy could not recover as damages the entire amount of the monthly advertising fee owed under the franchise agreement. According to the DSE Parties, Legacy could only recover some lesser amount representing the diminished value to Legacy's brand caused by the loss of the fees. Given that Legacy did not present any evidence from which the jury could calculate the diminution in value to Legacy's brand caused by the loss of the fees, the DSE Parties maintain that they were entitled to a directed verdict or j. n. o. v. on this counterclaim because Legacy failed to prove any recoverable damages. We disagree in light of our decision in *JLK*, where, in addition to addressing Legacy's lost royalty fees, we addressed Legacy's lost advertising fees.

In *JLK*, we reviewed the same advertising fees provision in Legacy's franchise agreements at issue here and determined that "the advertising fees require a different analysis than the royalty fees." 330 Ga. App. at 405 (3). We explained that "the purpose and expectation of the advertising fee was not an immediate profit to Legacy, but rather an overall enhancement of the Legacy brand per se." Id. Quoting 24 Williston on Contracts, § 64:2 (4th ed., 2014), we then concluded that

> the best measure of the value of the broken promise is the value assigned
> to it by the parties themselves. Basing damages on an amount equal to

24

what the promisor and especially, the promisee, believed the promise to be worth, reflects better than any other measure the loss caused by the breach. Damages based on protection of the promisee's expectation interest are not only the most accurate means of measuring loss following a breach of contract but also the most typical measure of recovery granted.

(Punctuation omitted.) *JLK*, 330 Ga. App. at 405-406 (3).

Under the terms of the franchise agreement, the parties assigned a value to the advertising fee of one percent of a franchisee's gross monthly revenue, and, based on our reasoning in *JLK*, that figure could be used to measure the value of DSE's broken promise to pay monthly advertising fees under the circumstances of this case. Thus, contrary to the DSE Parties' position, Legacy was not required to calculate how much the loss of the fees diminished its brand, but instead could rely on the value assigned to the fees by the parties themselves – one percent of DSE's gross monthly revenue – as a basis for its damages. Consequently, the trial court committed no error in denying the DSE Parties' motions for directed verdict and j. n. o. v. on Legacy's counterclaim to recover lost advertising fees.

In summary, in Case. No. A16A0174, we conclude that the trial court should have granted the Legacy Parties' motions for directed verdict and j. n. o. v. on the

25

DSE Parties' claims for negligent misrepresentation and negligence under OCGA § 51-1-6. In contrast, the trial court committed no error in denying Legacy's motion for directed verdict on its counterclaim for attorney fees. The final judgment therefore is reversed to the extent that judgment was entered in favor of the DSE Parties on their claims for negligent misrepresentation and negligence, and the case is remanded for reentry of a judgment consistent with this opinion. In Case No. A16A0175, we conclude that the trial court committed no error in denying the DSE Parties' motions for directed verdict and j. n. o. v. on Legacy's counterclaims for lost royalties and lost advertising fees, and the judgment is affirmed in that case.

*Judgment affirmed in part, reversed in part, and case remanded with direction in Case No. A16A0174. Judgment affirmed in Case No. A16A0175. Boggs and Rickman, JJ., concur.*

26