A04A1156. NEWITT et al. v. FIRST UNION NATIONAL BANK et al.
(607 SE2d 188)

SMITH, Chief Judge.

Ronald Newitt and Ross Robertson, two self-described "unsophisticated investors,"[1] filed suit against First Union National Bank and other defendants. Their multi-count complaint included claims for purported violations of federal and state securities laws, breach of fiduciary duty, negligent misrepresentation, and negligence. The essence of their lawsuit was that First Union provided inappropriate investment advice and failed to advise them of the consequences of taking that advice. The trial court awarded summary judgment against Newitt and Robertson on all claims. We agree with the trial court that the claims fail as a matter of law and therefore affirm.

In February 1998, Newitt and Robertson sold their company, Alta Telecom, Inc. to Ciena Corporation (Ciena). The transaction was structured so that, in lieu of cash, Newitt received 550,000 shares and Robertson received 450,000 shares in Ciena, the acquiring company. At that time, the aggregate one million shares had a market value of $54,000,000. Their shares of Ciena stock were restricted, however. The shares could not be hedged[2] until May 19, 1998, and could not be

---

[20] *Swords*, supra at 897.

[1] Newitt participated in the executive master of business administration program at Emory University from 1991-1993 and he attended an investment and security seminar presented by Goldman Sachs prior to making investments with First Union.

[2] Newitt's and Robertson's expert testified that "[a] standard way in which to hedge against the risks inherent in the ownership of stock [is] to purchase put options of a desired strike price,

sold or transferred until February 19, 1999.

From February through August 1998, Newitt and Robertson met with representatives of First Union Brokerage to discuss ways to manage their assets. Karen Beardslee, a First Union vice president, assembled a team of specialists who initially met Newitt and Robertson on February 27, 1998. At the February 27 meeting and at several subsequent meetings, bank representatives discussed arranging an "equity collar" that could be used to protect Newitt's and Robertson's Ciena holdings from a decline in Ciena's stock price. As their brief explains,

> [a] collar is the financial equivalent of a combination of a put option and a call option. A put option on a share of stock gives the stockholder the right to require a counter party to purchase that stock at a certain price on a specified future date. A call option on a share of stock gives the counter party the right to require the stockholder to sell the stock at a certain price on a specified future date. The price at which the stock is purchased or sold is called the "strike price" and the option is said to "expire" on the settlement date.

In May 1998, First Union discussed collars, put options, or selling the restricted stock to a third party at a deep discount. It was First Union's recommendation to Newitt and Robertson that they collar their Ciena stock to protect themselves from a possible decline in Ciena's price. Robertson conceded that on or about May 14, 1998, First Union had recommended that he purchase "a zero cost equity collar on a large portion of [my] position of the Ciena stock."

In a letter dated May 19, 1998, allegedly sent by facsimile, First Union offered Newitt and Robertson an equity collar for their Ciena stock.[3] William G. Griesser, a First Union vice president, proposed setting a floor (maximum depreciation) of $48.60 per share and a cap (maximum appreciation) of $64.80 that would protect their interests in their Ciena holdings for nine months from depreciating below 90 percent of its then current price of $54 per share. Griesser wrote, "In the event the ending stock price fell within the collar (between $48.60 and $64.80 per share) no payment would be required by First Union or you."

After the mid-May meeting, Newitt and Robertson did not accept First Union's recommendation to execute the equity collars on their

---

and then to sell call options against the same stock at a higher price."

[3] Newitt and Robertson both deny seeing this correspondence or receiving a copy by facsimile.

Ciena stock. Nor did they choose to enter into any of the hedging alternatives proposed by First Union. On or about June 1, 1998, to position themselves for entering into a hedging transaction, including collaring Ciena, Newitt and Robertson each signed an International Swap Dealer's Association (ISDA) Master Agreement, the Schedule thereto, and a Pledge Agreement. These agreements, read together with any trade confirmations that the parties were to sign in the future for transactions, constituted the parties' entire agreement on any collar transactions.

On June 3, 1998, Ciena announced that it was to be acquired by Tellabs, Inc. in a merger. After the announced merger, First Union was no longer willing to enter into the equity collar transactions on Ciena stock. Bank officials believed that an equity collar could potentially expose First Union to excessive risks if the proposed merger collapsed and resulted in the stock price of Ciena suffering a significant decline.

In mid-June, First Union officials met with Newitt and Robertson. Griesser testified that at the meeting, they offered two options to Newitt and Robertson, putting a collar on Tellabs and "buying listed put options." Griesser testified that they discussed the risks of Ciena's price falling and Tellabs' price rising if the merger deal did not go through.

By a letter dated June 16, 1998, and also allegedly sent by facsimile, Griesser proposed that First Union create an equity collar on Tellabs stock.[4] Griesser explained that *"as a result of the recent merger talks between Cienna [sic] and Tellabs (TLAB), we cannot offer a hedge on [Ciena] CIEN.* If you believe that the merger will occur and you are concerned about price risk of the potential new shares of TLAB, you can enter into a hedge on TLAB (please read page 2 for additional risks)." (Emphasis supplied.) Griesser wrote that "[w]e believe that the equity collar presented below may potentially mitigate the price risk involved with your current Cienna [sic] Corporation (CIEN) stock position." Griesser suggested that Newitt and Robertson consider an equity hedge on the TLAB stock price until February 1999 with the collar on TLAB stock set between $51 and $80.96 per share. Griesser pointed out that

> the TLAB collar will only protect you against declines in TLAB stock, which may or may not mirror the performance of CIEN. Further, if the price of CIEN and TLAB deviate from each other, you may not have protection against declines in

---

[4] Newitt and Robertson denied receiving this correspondence.

CIEN and you may . . . owe First Union if the ending stock price of TLAB is above the cap price.

Both men fully expected the merger to occur and did not rely upon First Union in forming that opinion. They also anticipated that their Ciena stock would be converted into Tellabs. On June 23, 1998, Robertson executed a collar on 250,000 shares of Tellabs stock with an expiration date of February 23, 1999. On June 23, 24, and 25, 1998, Newitt executed collars on a total of 250,000 shares of Tellabs stock with expiration dates of February 23, 24, and 25, 1999.[5]

On August 21, 1998, the proposed Tellabs/Ciena merger came into "serious question." First Union informed Newitt and Robertson that with the merger called off, "there was no downside protection on Ciena." First Union asked to meet with them to discuss their current investment situation, in part, because Newitt and Robertson held collars on a stock that they did not own and the "stock they did own was plummeting." First Union offered to "unwind" their collars on Tellabs, "so that they would not potentially owe the bank." As one First Union official testified, "they had just on paper lost 42 million dollars." Instead of waiting until February 1999 when their Tellabs collars would expire, Newitt and Robertson accepted First Union's offer to unwind the collars immediately.

On August 25, 1998, First Union unwound the Tellabs collars and paid $889,566 to Newitt and $619,508 to Robertson on those collars. Because Newitt and Robertson had executed the collars on Tellabs at zero cost, they obviously profited from their Tellabs collars, as they both admit. After the demise of the merger between Tellabs and Ciena, First Union was again willing to consider executing collars on Ciena. On August 28, 1998, Newitt and Robertson and First Union discussed potential collars and put alternatives relating to their Ciena stock. After those discussions in August, Newitt and Robertson did not opt to enter into any hedging transactions of any kind with First Union, including authorizing entry of any collars on Ciena. Instead, they apparently transferred their investment business elsewhere.[6]

On March 13, 2000, more than eighteen months after deciding to unwind their Tellabs collars, Newitt and Robertson filed a ten count

---

[5] Although both men initially claimed that they thought their collars were on Ciena, Robertson admitted that First Union told him that he was collaring Tellabs stock. Likewise, when Newitt faxed confirmations of the transactions, the documents reflected that he was placing a "Tellabs, Inc. (TLAB) – collar."

[6] Robertson collared 100,000 shares of his Ciena stock with Goldman Sachs in September 1998.

complaint against First Union and other defendants. Their suit alleged violations of federal securities laws and the Georgia Securities Act and claims for breach of fiduciary duty, negligent misrepresentation, negligence, and punitive damages.

The thrust of their complaint was that by recommending the collars on Tellabs instead of on Ciena, the defendants "failed to protect Plaintiffs from this decline and . . . the value of Plaintiffs' positions in the Ciena stock has been dramatically diminished." They further alleged that the defendants "failed to provide Plaintiffs with an adequate explanation of the risks involved in collaring the Tellabs stock instead of the Ciena stock, or that such action would leave the Ciena stock unprotected. Defendants failed to provide Plaintiffs with any other suitable hedging alternatives." They asserted that "[b]ased on the recommendations and information provided by Defendants, Plaintiffs believed their equity positions in Ciena to be protected, or 'hedged,' as explained to them by Defendants." They sought damages of not less than $15,024,850, damages for the loss of use of money and other damages, in particular, the profits that they could have obtained had Ciena rather than Tellabs been collared.

Newitt and Robertson appeal the summary adjudication of their claims.

1. Newitt and Robertson contend that the trial court erred in finding their federal securities law claims barred by the statute of limitation. They assert that their cause of action did not become complete until "February 23, 1999, the first expiration date of the equity collars." They argue that prior to that date the price of Ciena remained indeterminate, making any claim premature. They claim that by filing the arbitration claims on October 13, 1999, "the Bank parties" were afforded "formal and seasonable notice that a claim was being asserted against them and therefore satisfied the purpose of the statute of limitations."

Claims under Section 10 (b) of the Securities and Exchange Act of 1934 are governed by a one year statute of limitation, and litigation "must be commenced within one year after the discovery of the facts constituting the violation. . . ." *Lampf, Pleva, Lipkind, Prupis &c. v. Gilbertson*, 501 U. S. 350, 364 (IV) (111 SC 2773, 115 LE2d 321) (1991). "Discovery [of the facts] occurs when a potential plaintiff has inquiry or actual notice of a violation." (Citation and punctuation omitted.) *Theoharous v. Fong*, 256 F3d 1219, 1228 (IV) (C) (11th Cir. 2001). "Inquiry notice is the term used for knowledge of facts that would lead a reasonable person to begin investigating the possibility that his legal rights had been infringed." (Citation and punctuation omitted.) Id. Thus, an objective standard is applied. Id.

Here, the one year limitation period commenced August 25, 1998, when First Union unwound the Tellabs collars. As of that date,

Newitt and Robertson had no collars on either Tellabs or Ciena with First Union. The plaintiffs therefore were on inquiry notice that their Ciena stock was not protected by any collar or other arrangement with First Union. Because their federal securities claims were not filed until March 2000, those claims were untimely. See *Theoharous*, supra.

2. Newitt and Robertson assert that the trial court erred in granting summary judgment on their fraud claims brought under federal securities laws, the Georgia Securities Act, and common law. As discussed in Division 1, the federal securities law claims are time-barred. The other fraud claims fail on the merits because Newitt and Robertson failed to establish the essential elements required for a prima facie case of fraud.

To prevail on a claim for common law fraud, proof is required of these essential elements: (1) a false representation or omission of a material fact; (2) scienter; (3) an intent to induce the party alleging fraud to act or to refrain from acting; (4) justifiable reliance; and (5) damages. *ReMax North Atlanta v. Clark*, 244 Ga. App. 890, 893 (537 SE2d 138) (2000). The fraud claims here are rooted in assertions that First Union failed to reveal the substantial risk in collaring only Tellabs and failed to tell Newitt and Robertson that collaring Tellabs would not protect them from a fall in the price of Ciena.

In essence, they contend that First Union failed to present them with suitable hedging alternatives to protect their financial interests. "Analytically, an unsuitability claim is a subset of the ordinary § 10 (b) fraud claim." *Brown v. E. F. Hutton Group*, 991 F2d 1020, 1031 (II) (2nd Cir. 1993). To prove an unsuitability claim, a plaintiff must prove that the defendant: (1) made material misstatements or omissions; (2) indicating an intent to deceive or defraud; (3) in connection with the purchase or sale of a security. Id. "Reliance is an essential element of a cause of action under Rule 10 b-5. [Cits.]" *Ross v. Bank South*, 885 F2d 723, 728 (II) (11th Cir. 1989). Even assuming arguendo that First Union did not fully and completely advise them of all possible risks, they did not offer any evidence that First Union intended to deceive or defraud them. Newitt and Robertson, not First Union, profited from the Tellabs collars. Both investors admit that they suffered no direct loss as a result of the Tellabs collars but obtained a joint profit in excess of $1.5 million.

Moreover, "[a]n investor may not justifiably rely on a representation if, through minimal diligence, the investor should have discovered the truth. [Cit.] Under this standard, § 10 (b) liability will not be imposed when an investor's conduct rises to the level of recklessness. [Cit.]" *Brown*, supra at 1032 (II) (A). Here, in the Schedule to the ISDA Master Agreement, Newitt and Robertson acknowledged that they understood the agreement and the attendant risks; determined

the risks were appropriate and willingly assumed those risks; and reviewed the agreement carefully with their financial, legal, and tax advisors, to the extent that they deemed necessary. Both testified that they had access to legal counsel, accounting experts, and investment counselors.[7] See *Ross*, supra. Newitt and Robertson point to no evidence showing that they exercised minimal diligence in ascertaining whether collaring Tellabs would protect their positions in Ciena in the event that the merger did not occur. See *Brown*, supra. Newitt and Robertson failed to offer evidence of the element of reliance, which is essential to a fraud claim. See *Clark*, supra.

Also, a party to a contract who believes that he has been tortiously induced into entering that contract has "two options: (1) affirm the contract and sue (in contract) for breach; or (2) rescind the contract and sue in tort for fraud. [Cits.]" *Estate of Sam Farkas v. Clark*, 238 Ga. App. 115, 117 (1) (517 SE2d 826) (1999). Newitt and Robertson never rescinded their Tellabs collar agreements nor did they return the $1.5 million in profits received on those collars. They therefore remain bound by the plain, unambiguous language in the Tellabs collar agreements, terms that expressly preclude the allegations that form the basis of their fraud claims.

3. Newitt and Robertson contend that the trial court erred in granting summary judgment on their negligent misrepresentation claims. They allege that: First Union failed to disclose "the high degree of risk" that arose from using a collar on Tellabs to protect their positions in Ciena stock; First Union failed to protect them from a decline in the price of Ciena; and First Union failed to provide them "with any other suitable hedging alternatives."

To support these claims, they offered the expert testimony of Robert E. Conner. Conner testified that First Union's recommendation to collar Tellabs stock

> was an unsuitable and severely reckless proposal that, rather than constituting a risk reducing hedge against the respective Ciena stock positions owned by Newitt and Robertson, was, instead, a transaction that created additional risk of such a speculative nature as to be inherently ill-advised.

In Conner's expert opinion,

---

[7] In March or April 1998, Newitt had split his stock holdings, less the 35,000 or 50,000 shares held in escrow by an agent in Boston, between First Union and Goldman Sachs with each holding approximately 50 percent of his unescrowed shares. According to Newitt, "I think both sides were aware that I did not want to put all my eggs in one basket, and I was looking to measure them on their performance."

[t]he Tellabs "collar" could not have been recommended by First Union Bank to [them] without making material [misrepresentations], either overtly or by omission, as to the risks and [characteristics] of the proposed transaction, as well as the basis upon which it was to have purportedly fit [their] concerns with respect to their existing Ciena stock position.

Conner also testified that First Union could instead have recommended "a viable 'bona fide' hedge against their Ciena positions."

Newitt and Robertson, however, did not offer any evidence that other suitable hedging alternatives were available at First Union or at any other financial institution or brokerage during the time between the merger announcement and the collapse of the merger. Furthermore, regardless of whether First Union should have presented them "with other suitable hedging alternatives," or should have advised them that their holdings in Ciena were not protected by the collars on Tellabs, Newitt and Robertson cannot overcome the undisputed evidence that they were not damaged by the equity collars placed on Tellabs.

Robertson acknowledged that in claiming damages in excess of $15,024,850 he was seeking "[t]he profits I could have made" if Ciena had been collared as opposed to Tellabs. Newitt and Robertson cite no law, and we know of none, that would have required First Union to collar Ciena at a time when it had no desire to do so or that First Union was under an obligation to present a "viable 'bona fide' hedge" to them during the pendency of the merger. The trial court did not err in entering judgment as a matter of law for First Union.

4. Newitt and Robertson assert that jury issues remain for resolution on their breach of fiduciary duty claims. They contend that a jury should decide whether a confidential relationship existed. We cannot agree. For two reasons, no fiduciary or confidential relationship existed between the parties.

First, their contracts with First Union expressly stated that there was no fiduciary relationship. In the Schedule to the ISDA Master Agreement, they expressly acknowledged that the transaction was one at "arm's length" and that First Union did not bear any fiduciary relationship to them. They also acknowledged that they relied upon their own evaluation of the transaction and that to the extent necessary, they had reviewed the transaction with their advisors.

Second, "[i]n the majority of business dealings, opposite parties have trust and confidence in each other's integrity, but there is no confidential relationship by this alone." (Citations and punctuation omitted.) *Kienel v. Lanier*, 190 Ga. App. 201, 203 (2) (378 SE2d 359)

(1989). For this reason, most business relationships are not generally confidential or fiduciary relationships. See *Williams v. Dresser Indus.*, 120 F3d 1163, 1168 (11th Cir. 1997). Where parties are engaged in a transaction to further their own separate business objectives, there is no duty to represent or advance the other's interests. *Kienel*, supra at 204. A fiduciary relationship arises only "where one party is so situated as to exercise a controlling influence over the will, conduct, and interest of another or where, from a similar relationship of mutual confidence, the law requires the utmost good faith, such as the relationship between partners, principal and agent, etc." OCGA § 23-2-58.

Newitt and Robertson cite no evidence that First Union exercised a controlling influence over their will, conduct, or interests. Nor did they establish that they relied upon First Union to make decisions on their behalf. In fact, the evidence shows the contrary: When First Union offered to collar Ciena in May 1998, they did not accept First Union's offer because they did not consider collaring Ciena as in their best interest. Newitt testified that he did not do so because he did not want to limit the gain that he could make on the upside of his Ciena stock. When pressed to explain why he had not agreed to First Union's recommendation, Newitt responded, "Probably because we wanted to see if the market would produce any further increase in the value of Ciena and, therefore, raise the put price." Similarly, when Robertson was asked what prevented him from following First Union's advice in mid-May to collar his Ciena stock, Robertson answered, "Personally, probably the reason why I didn't do it, it could have been based on where Ciena stock price was." Robertson added that between the end of May and the first two weeks of June after the announcement of the merger, Ciena's stock price had begun to rise. Such testimony fails to show that First Union exercised a controlling influence over them or that these investors were not fully capable of making independent business decisions. See OCGA § 23-2-58.

5. Newitt and Robertson maintain that a jury must resolve their negligence claims. They contend that First Union acted negligently by providing investment advice that failed to provide downside protection for their holdings in Ciena.

To prevail on a claim for negligent misrepresentation, Newitt and Robertson had to produce evidence that First Union negligently supplied them false information, that they reasonably relied upon that false information, and that they sustained "economic injury proximately resulting from such reliance." (Citation and footnote omitted.) *Hardaway Co. v. Parsons, Brinckerhoff, Quade &c.*, 267 Ga. 424, 426 (1) (479 SE2d 727) (1997). It is axiomatic that a negligence claim requires proof that a defendant owed a duty, breached that duty, and that the alleged breach "was the proximate cause" of the

damages. *Bradley Center v. Wessner*, 250 Ga. 199, 200 (296 SE2d 693) (1982). "A plain reading of the essential elements underlying [this] cause of action shows that in order to file a legitimate claim, [the plaintiffs] had to show actual economic loss proximately resulting from [the defendants'] negligent misrepresentation." (Citation and footnote omitted.) *Hardaway Co.*, supra at 427 (1).

Without deciding whether First Union supplied any false information or told them that by collaring Tellabs they would be protecting their interests in Ciena, we note the absence of evidence of an economic injury that proximately resulted from their reliance on First Union's recommendation to collar Tellabs.[8] See *Hardaway Co.*, supra. Both men benefitted financially from executing the collars on Tellabs with First Union. Collectively, their net profit exceeded $1.5 million. In the absence of evidence of an actual economic injury that proximately resulted from executing the collars on Tellabs, these claims must fail as a matter of law. See id. at 426-427.

6. Newitt and Robertson contend that the trial court erred in granting summary judgment on their punitive damages claims. We disagree. "Punitive damages cannot be imposed without a finding of some form of culpable conduct. Negligence, even gross negligence, is inadequate to support a punitive damage award." (Citation omitted.) *Colonial Pipeline Co. v. Brown*, 258 Ga. 115, 118 (3) (b) (365 SE2d 827) (1988). In light of the failure of the fraud and breach of fiduciary duty claims,[9] no valid basis remains on which to authorize punitive damages. See *Young v. Turner Heritage Homes*, 241 Ga. App. 400, 401-402 (2) (526 SE2d 82) (1999); see also *Durben v. American Materials*, 232 Ga. App. 750, 751-753 (1) (503 SE2d 618) (1998).

*Judgment affirmed. Johnson, P. J., and Phipps, J., concur.*

DECIDED NOVEMBER 19, 2004.

*Friend, Hudak & Harris, William D. Friend, Steven W. Hardy,* for appellants.

*Troutman Sanders, Stephen W. Riddell, Lynette E. Smith, Davidson & Tucker, Gerald Davidson, Jr.,* for appellees.

---

[8] Newitt sold Ciena stock for as much as $190 per share in 2000.

[9] While we do not reach the issue, we question whether a claim for negligent breach of fiduciary duty would support the award of punitive damages in any event. See *Ivey v. Golden Key Realty*, 200 Ga. App. 545-546 (1) (408 SE2d 811) (1991).