**2019 UT App 146**

## THE UTAH COURT OF APPEALS

1600 BARBERRY LANE 8 LLC AND 1600 BARBERRY LANE 9 LLC,
Appellants,
*v.*
COTTONWOOD RESIDENTIAL OP LP, COTTONWOOD CAPITAL
PROPERTY MANAGEMENT II LLC, COTTONWOOD CAPITAL PROPERTY
MANAGEMENT INC., AND DANIEL SHAEFFER,
Appellees.

Opinion
No. 20180105-CA
Filed August 22, 2019

Third District Court, Salt Lake Department
The Honorable Robert P. Faust
No. 170904221

Kenneth J. Catanzarite and Andrew G. Deiss,
Attorneys for Appellants

Matthew L. Lalli, Michael A. Gehret, W. Danny
Green, and Henry H. Oh, Attorneys for Appellees

JUDGE DIANA HAGEN authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and JILL M. POHLMAN concurred.

HAGEN, Judge:

¶1     Plaintiffs 1600 Barberry Lane 8 LLC and 1600 Barberry Lane 9 LLC (the Owners), two tenant-in-common owners of an apartment complex in Georgia (the Property), appeal the district court's dismissal of their amended complaint. The Owners sued Cottonwood Residential OP LP, Cottonwood Capital Property Management II LLC, Cottonwood Capital Property Management Inc., and Daniel Shaeffer (collectively, Cottonwood) for breach of fiduciary duty or aiding and abetting breach of fiduciary duty and breach of contract or tortious interference with a contract.

The Owners' claims arise out of the property management agreement (the Agreement) between the Owners and Todd Mikles and Daymark Residential and Asset Management (collectively, Daymark),[1] who contracted to provide property and asset management services for the Property. The Owners assert that Cottonwood breached the Agreement and its fiduciary duty to the Owners by charging fees that exceeded market rates for property and asset management services or, alternatively, that Cottonwood induced or aided and abetted Daymark in doing so. We conclude that the Owners have not stated a claim for breach of fiduciary duty because the Agreement does not give rise to a fiduciary duty on behalf of either Daymark or Cottonwood with respect to the fees they charged for their services. And because the Agreement contained no provision limiting management fees to market value, we conclude that neither Cottonwood nor Daymark breached the Agreement by charging fees that allegedly exceeded market rate. Accordingly, we affirm the district court's dismissal of the amended complaint for failure to state a claim upon which relief could be granted.

BACKGROUND[2]

¶2      In 2008, the Owners each acquired a 1.478% interest in the Property, which was a "312 unit garden apartment community"

---

1. The property manager listed in the Agreement was Grubb & Ellis Company, which later became Daymark. The Owners have filed suit against Daymark in another court, but Daymark was not named as a defendant in this action and is not a party.

2. "On appeal from a motion to dismiss, we review the facts as they are alleged in the complaint." *Ho v. Jim's Enters., Inc.*, 2001 UT 63, ¶ 2, 29 P.3d 633.

located in a suburb of Atlanta, Georgia. At that time, the Owners entered into the Agreement with Daymark for property and asset management services relating to the Property. The Agreement contained a choice of law provision stating that any disputes arising under the Agreement would be governed by Georgia law.[3] In relevant part, the Agreement provided:

> 2.1 <u>Status of Property Manager.</u> The [Owners] and [Daymark] do not intend to form a joint venture, partnership or similar relationship. Instead, the parties intend that [Daymark] shall act solely in the capacity of an independent contractor for [the Owners]. Nothing in [the] Agreement shall cause [Daymark] and [the Owners] to be joint venturers or partners of each other, and neither shall have the power to or obligate the other party by virtue of [the] Agreement, except as expressly provided in this Agreement. Nothing in [the] Agreement shall deprive or otherwise affect the right of either party to own, invest in, manage, or operate, or to conduct business activities which compete with, the Property. . . .
>
> 2.2 <u>Management.</u> [Daymark] shall be the sole and exclusive manager of the Property to act on behalf of [the Owners] and shall manage, operate and maintain the Property in an efficient, economic, and satisfactory manner and shall manage the

---

3. The parties agree that under the Agreement's choice of law provision, Georgia law governs the substance of the Owners' claims. While we apply Georgia law "to the substantive issues presented in this case, we still follow our own rules of procedure." *Waddoups v. Amalgamated Sugar Co.*, 2002 UT 69, ¶ 20, 54 P.3d 1054.

performance of everything reasonably necessary for the proper operation of the Property for the tenants thereof . . . [Daymark] shall perform all services in a diligent and professional manner . . . .

. . . .

2.14 <u>Right to Subcontract Property Management Functions.</u> [Daymark] reserves the right, in its sole discretion, to subcontract some or all of the property management functions described herein to local property managers and certain other parties. However, except as expressly provided herein, the fees to be paid to [Daymark] under [the] Agreement are inclusive of fees payable to such third parties . . . .

. . . .

9.1 <u>Property Management Fee.</u> [Daymark], or an affiliate, shall receive, for its services in managing the Property in accordance with the terms of [the] Agreement, a monthly management fee . . . and a monthly asset management fee . . . . The Property Management Fee shall be up to three percent (3%) of Gross Revenues . . . and the Asset Management Fee shall be up to two percent (2%) of Gross Revenues . . . . The Property Management Fee is set forth in the annual Budget approved by [the Owners] in accordance with Section 2.5 hereof . . . .

. . . .

11. <u>Conflicts.</u> [Daymark] shall not deal with or engage, or purchase goods or services from, any subsidiary or affiliated company of [Daymark] in

> connection with the management of the Property
> for amounts above market rates . . . .
>
> . . . .
>
> 13.1 <u>Assignment.</u> [Daymark] may not assign [the]
> Agreement without the prior written consent of
> each of [the Owners] which consent may be
> withheld in each [of the Owner's] sole and absolute
> discretion . . . .

Section 2.5 also provided that Daymark would prepare and submit to the Owners "an initial capital and operating budget . . . for the promotion, operation, leasing . . . , repair, maintenance and improvement of the Property" for each calendar year, which the majority of the Owners must approve.

¶3    In October 2012, Daymark announced that it had decided to focus its efforts on its commercial-office-property portfolio and recommended to the Owners that Cottonwood take over management services for the Property. The Owners "acquiesced" and allowed Cottonwood to assume the role of asset and property manager for the Property. But they allege that they would not have consented to this change if Daymark had disclosed that the Agreement's asset and property manager fees exceeded the fair market rate for the services. The Owners allege that the excessively high fees accounted for Cottonwood's willingness to purchase the Agreement from Daymark for $8 million.[4]

---

4. The Owners allege that Daymark sold the Agreement to Cottonwood and that Cottonwood thereby "subsumed from [Daymark] all of their obligations in the [Agreement]." In ruling on the motion to dismiss, the district court considered the

(continued…)

¶4     In June 2017, the Owners filed a complaint against Cottonwood, alleging that Cottonwood had breached a fiduciary duty it owed to the Owners or, in the alternative, aided and abetted Daymark in the breach of its fiduciary duty. Specifically, the Owners alleged that Daymark had a fiduciary duty to disclose that transferring the Agreement to Cottonwood was not in the Owners' best interests because it would allow Cottonwood to continue collecting above-market fees. The complaint alleged that Cottonwood both aided and abetted Daymark's breach and was "directly liable . . . as the successor fiduciary" to Daymark for failing to disclose facts that would have led the Owners to discover that they were being overcharged.

¶5     Under rule 12(b)(6) of the Utah Rules of Civil Procedure, Cottonwood moved to dismiss the Owners' action for failure to state a claim upon which relief can be granted, to which the Owners responded by filing an amended complaint. In their amended complaint, the Owners again asserted their fiduciary duty claim and added two alternative claims: breach of contract and interference with contract. In their breach of contract claim,

---

(…continued)

contract between Daymark and Cottonwood, which the Owners did not attach to or expressly reference in their pleading, and concluded that Daymark did not assign the Agreement to Cottonwood but rather engaged Cottonwood as a subcontractor. The Owners allege that the district court improperly considered the contract between Daymark and Cottonwood without converting the motion to dismiss to one for summary judgment. *See* Utah R. Civ. P. 12(b). We need not decide whether this was error, because we affirm the district court without regard to the contract between Daymark and Cottonwood. In other words, our analysis does not depend on whether Cottonwood was an assignee of or a subcontractor under the Agreement.

the Owners alleged that the fees under the Agreement "were capped at the lesser of market value for the actual services provided or for the maximum listed fee" and that Cottonwood breached the Agreement by "charging and continuing to overcharge[] asset and property management fees in excess of fair value." Alternatively, the Owners alleged that, by paying Daymark $8 million in "exchange for all future property management and asset management fees at rates in excess of fair value," Cottonwood "improperly induced" Daymark to breach the provisions of the Agreement that allegedly capped fees "at the lesser of market value or the maximum listed fee."

¶6 In response to the Owners' amended complaint, Cottonwood filed another motion to dismiss for failure to state a claim. The Owners opposed that motion, and the district court heard argument on it. At argument, Cottonwood contended that, as a matter of Georgia law, a property manager does not "owe a fiduciary duty to forego enjoying the benefits of the bargain that the parties struck in a written property management agreement." Because the Owners had not alleged that Daymark and Cottonwood charged more than the negotiated fees set forth in the Agreement, Cottonwood also argued that the Owners' allegations did not amount to either a breach of contract or a breach of fiduciary duty.

¶7 The district court granted Cottonwood's motion to dismiss on a number of alternative grounds. In granting the motion, the district court determined, among other things, that Cottonwood did not owe the Owners a fiduciary duty, because the Agreement between the parties did not give rise to a confidential relationship under Georgia law. The district court also ruled that the Owners could not state a claim for breach of contract or interference with contract based on the alleged practice of charging above-market rates, because nothing in the Agreement limited the property and asset management fees to market rate. The Owners appeal.

ISSUE AND STANDARD OF REVIEW

¶8 The Owners contend that the district court erred in granting Cottonwood's motion to dismiss, arguing that the amended complaint contained sufficient allegations to sustain claims of breach of contract, tortious interference with a contract, and breach of and aiding and abetting the breach of fiduciary duty.[5] "We review a decision granting a motion to dismiss for correctness, granting no deference to the decision of the district court," *Bylsma v. R.C. Willey*, 2017 UT 85, ¶ 10, 416 P.3d 595 (quotation simplified), and "likewise review the district court's subsidiary legal determinations for correctness," *Fehr v. Stockton*, 2018 UT App 136, ¶ 8, 427 P.3d 1190.

---

5. The Owners include two other issues in their statement of the issues on appeal. Their second issue—whether the district court erred in denying the Owners' motion for leave to amend the complaint a second time—is mentioned only in the statement of issues on appeal. The issue is never mentioned again in the Owners' opening brief and accordingly, we do not reach it. *See Utah Physicians for a Healthy Env't v. Executive Dir. of the Utah Dep't of Env'tl Quality*, 2016 UT 49, ¶ 27, 391 P.3d 148 ("A party may not dump the burden of argument and research on the appellate court." (quotation simplified)) The Owners' third issue is whether the district court erred in failing to convert Cottonwood's motion to dismiss into a motion for summary judgment because the court considered material outside the pleadings. As mentioned, *supra* note 4, it is unnecessary to reach that issue because we affirm solely on the basis of the complaint and the documents attached to the complaint. *See Oakwood Village LLC v. Albertsons, Inc.*, 2004 UT 101, ¶ 12, 104 P.3d 1226 ("If a court does not exclude material outside the pleadings and fails to convert a rule 12(b)(6) motion to one for summary judgment, it is reversible error unless the dismissal can be justified without considering the outside documents.").

ANALYSIS

¶9 When reviewing a dismissal under rule 12(b)(6) of the Utah Rules of Civil Procedure, "our inquiry is concerned solely with the sufficiency of the pleadings, and not the underlying merits of the case." *Oakwood Village LLC v. Albertsons, Inc.*, 2004 UT 101, ¶ 8, 104 P.3d 1226 (quotation simplified). "A Rule 12(b)(6) motion to dismiss admits the facts alleged in the complaint but challenges the plaintiff's right to relief based on those facts." *Id.* (quotation simplified). Accordingly, "we accept the plaintiff's description of facts alleged in the complaint to be true, but we need not accept extrinsic facts not pleaded nor need we accept legal conclusions in contradiction of the pleaded facts." *America West Bank Members, LC v. State*, 2014 UT 49, ¶ 7, 342 P.3d 224 (quotation simplified). To survive a rule 12(b)(6) motion, a complaint must "allege sufficient facts . . . to satisfy each element" of every claim. *Id.* ¶ 15 (quotation simplified).

¶10 The Owners maintain that they sufficiently pleaded facts supporting claims of breach of fiduciary duty or aiding and abetting a breach of fiduciary duty, breach of contract, and tortious interference with a contract. We affirm the court's dismissal of all three claims on the following grounds: (1) the Owners failed to state a claim for breach of fiduciary duty because the Agreement did not create a fiduciary duty with respect to fees; and (2) the Owners failed to state a claim for either breach of contract or tortious interference with a contract because the allegation that Cottonwood and Daymark charged above-market rates, if true, would not constitute a breach of the Agreement.

## I. Fiduciary Duty

¶11 The Owners argue that Cottonwood breached its fiduciary duty to the Owners by charging above-market property and asset management fees without disclosing that

those fees were above market value. The Owners further allege that Cottonwood aided and abetted Daymark's breach of the same fiduciary duty by paying Daymark $8 million in exchange for allowing Cottonwood to perform the services for the same fees under the Agreement. However, because the Agreement does not create a fiduciary duty with respect to fees, the Owners have failed to state a claim under either theory.

¶12 Under Georgia law, to state a claim for breach of fiduciary duty, the Owners must allege facts that demonstrate "the existence of a fiduciary duty," "breach of that duty," and damages. *Ansley Marine Constr., Inc. v. Swanberg*, 660 S.E.2d 6, 9 (Ga. Ct. App. 2008) (quotation simplified). To state a claim for aiding and abetting breach of fiduciary duty, the Owners must allege facts that demonstrate Cottonwood, "through improper action or wrongful conduct and without privilege," purposely, with malice, with the intent to injure, and "with the knowledge that [Daymark] owed [the Owners] a fiduciary duty" acted to procure a breach of Daymark's fiduciary duty to the Owners, and that Cottonwood's actions "procured" Daymark's breach, resulting in damages. *See Insight Tech., Inc. v. FreightCheck, LLC*, 633 S.E.2d 373, 379 (Ga. Ct. App. 2006). Importantly, under either theory, the existence of a fiduciary duty is a necessary element of the claim.

¶13 Fiduciary duties arise from confidential relationships, including those created by contract. *See Douglas v. Bigley*, 628 S.E.2d 199, 204 (Ga. Ct. App. 2006). By statute, Georgia defines confidential relationships as follows:

> Any relationship shall be deemed confidential, whether arising from nature, created by law, or resulting from contracts, where one party is so situated as to exercise a controlling influence over the will, conduct, and interest of another or where, from a similar relationship of mutual confidence,

> the law requires the utmost good faith, such as the
> relationship between partners, principal and agent,
> etc.

Ga. Code Ann. § 23-2-58 (LexisNexis 2019). "The mere fact that one reposes trust and confidence in another does not create a confidential relationship . . . and the burden is upon the party asserting the existence of such relationship to affirmatively show the same." *Allen v. Hub Cap Heaven, Inc.*, 484 S.E.2d 259, 264 (Ga. Ct. App. 1997) (quotation simplified); *see also Parello v. Maio*, 494 S.E.2d 331, 333 (Ga. 1998) (noting that "the mere circumstance that two people have come to repose a certain amount of trust and confidence in each other as the result of business dealings is not, in and of itself, sufficient to find the existence of a confidential relationship").

¶14   Georgia law recognizes that "most business relationships are not generally confidential or fiduciary relationships." *Newitt v. First Union Nat'l Bank*, 607 S.E.2d 188, 196 (Ga. Ct. App. 2004). "Where parties are engaged in a transaction to further their own separate business objectives, there is no duty to represent or advance the other's interests." *Id.*

¶15   In this case, the Owners rely exclusively on the Agreement as the basis of the fiduciary duty. In the amended complaint, the Owners allege that the property manager was a fiduciary because it "was obligated to perform asset management and real estate property management services" for the Owners' benefit. The Owners further allege that "having subsumed the fiduciary duties of property and asset manager" under the Agreement, Cottonwood became the "successor fiduciary." Thus, the Owners rely on the contractual relationship between the parties as the basis for the fiduciary duty.

¶16   The Agreement authorizes the property manager to act on behalf of the Owners to "manage, operate and maintain the

Property in an efficient, economic and satisfactory manner." But an agent is only a fiduciary with respect to the matters within the scope of its agency. *See American Mgmt. Services East, LLC. v. Fort Benning Family Communities, LLC*, 774 S.E.2d 233, 249 (Ga. Ct. App. 2015) (applying Virginia law). Even assuming that the property managers owed the Owners fiduciary duties when performing management services, the Agreement does not impose an obligation on the property manager to act on the Owners' behalf in setting the fees for its services.

¶17 The Agreement requires the property manager to act on behalf of the Owners in performing its management duties, but makes clear that the property manager is not acting as the Owners' agent in all respects. The Agreement expressly states that the parties "do not intend to form a joint venture, partnership, or similar relationship" and that the property managers "shall act solely in the capacity of an independent contractor." Georgia courts have held that no confidential relationship exists where, as here, the "contract expressly provided for an independent contractor relationship" and "the parties were engaged in a transaction *with each other* in an effort to further their own separate business objectives." *Allen*, 484 S.E.2d at 264; *see also Automated Sol. Enters., Inc. v. Clearview Software, Inc.*, 567 S.E.2d 335, 338 (Ga. Ct. App. 2002) (holding that the relationship between the parties was not confidential but was "merely a business relationship between two independent concerns" where the contract provided that the plaintiff was an independent contractor and disclaimed any intent to form a partnership or joint venture). In setting the amount to be charged for the property manager's services, the parties were engaged in an ordinary business transaction in which both sides were representing their own interests. *See Morrell v. Wellstar Health System, Inc.*, 633 S.E.2d 68, 74 (Ga. Ct. App. 2006) (holding that "[w]hen nonprofit hospitals and their patients enter into agreements on the price to be charged for medical care, they are

ordinarily engaged in business transactions indistinguishable from those engaged in by for-profit corporations with no confidential or fiduciary relationship between the parties").

¶18 In fact, the Agreement specifically provides a mechanism for each party to look out for its own best interests with respect to fees. Instead of granting the property manager unfettered discretion to set the total fees up to the 3% cap, the Agreement requires that the property manager set forth its management fees in a yearly budget that is subject to approval by the Owners. In other words, the Agreement does not place the property manager in a position "to exercise a controlling influence over the will, conduct, and interest" of the Owners or in "a similar relationship of mutual confidence" with respect to the fees charged for management services. *See* Ga. Code Ann. § 23-2-58 (2019). Discretionary control over the amount of management fees did not lie with the property manager but with the Owners. Because the property manager did not exercise a controlling influence or hold a similar relationship of mutual confidence with respect to setting fees, it had no obligation to act in the Owners' best interests when charging for its services.

¶19 In sum, based on the Agreement, neither Daymark nor Cottonwood owed the Owners a fiduciary duty with respect to fees charged for their services. Because the Agreement is the only basis alleged for the existence of a fiduciary duty, the amended complaint fails to state a claim for either breach of fiduciary duty or aiding and abetting such a breach.

## II. Breach of the Agreement

¶20 The Owners also allege that Cottonwood breached the Agreement by charging above-market property and asset management fees or, in the alternative, "improperly induced [Daymark] to breach its obligation" under the Agreement by paying Daymark $8 million in "exchange for all future property

management and asset management fees at rates in excess of fair value." The district court determined that, even assuming that Cottonwood was a party to the Agreement between the Owners and Daymark, the facts alleged in the amended complaint could not establish breach of contract by either Cottonwood or Daymark because the Agreement contained no provision limiting management fees to market value rates. We need not first determine whether Cottonwood is a party to the Agreement, because we agree with the district court that the Owners have failed to allege a breach of the Agreement regardless of the parties' legal relationships.

¶21    To state a claim for either breach of contract or tortious interference with a contract, a party must have sufficiently alleged a breach of a contractual obligation. *See Reindel v. Mobile Content Network Co.*, 652 F.Supp.2d 1278, 1287 (N.D.Ga. 2009) (explaining that, in order "[t]o establish a breach of contract claim, a plaintiff must show (1) an enforceable agreement, (2) breach of that agreement, and (3) damages as a result of that breach"); *White v. Shamrock Bldg. Sys., Inc.*, 669 S.E.2d 168, 174 (Ga. Ct. App. 2008) (explaining that, to succeed in a tortious interference claim, the plaintiff must show the defendants, "without privilege, acted improperly, purposely, and with malice with the intent to injure" and "that they induced a breach of a contractual obligation"). Here, both claims fail because the facts alleged in the amended complaint cannot establish a breach of the Agreement.

¶22    The Owners allege that Daymark and Cottonwood charged above-market property and asset management fees and that such fees were prohibited under the Agreement. The Owners argue that when read together, the terms of sections 9.1 and 2.2 of the Agreement preclude Daymark and Cottonwood from charging fees that exceeded the market value for property and asset management. "An issue of contract construction is at the outset a question of law for the court." *Grier v. Brogdon*, 505

S.E.2d 512, 514 (Ga. Ct. App. 1998). Under Georgia law, contracts must be construed in accordance with the intention of the parties. Ga. Code Ann. § 13-2-3 (2019). To ascertain the intention of the parties, we first "look to the four corners of the instrument to determine the meaning of the agreement from the language employed." *Barrow County Airport Auth. v. Romanair, Inc.*, 563 S.E.2d 467, 470 (Ga. Ct. App. 2002). "If the terms used are clear and unambiguous they are to be taken and understood in their plain, ordinary, and popular sense." *Race, Inc. v. Wade Leasing, Inc.*, 411 S.E.2d 56, 57 (Ga. Ct. App. 1991) (quotation simplified).

¶23    Looking at the four corners of the Agreement, there is no provision limiting the property and asset management fees to "market value." Section 9.1 of the Agreement provides: "The Property Management Fee shall be up to three percent (3%) of Gross Revenues . . . and the Asset Management Fee shall be up to two percent (2%) of Gross Revenues." Although this provision clearly limits the property and asset management fees to 3% and 2% of gross revenues, respectively, the limits are not tied to market value and the Owners have not alleged that the fees charged exceeded the stated limits. Section 9.1 also requires that the fees be set forth in the annual budget the property manager submits to the Owners for approval, but there is no allegation that Daymark or Cottonwood failed to disclose the fee amounts in the budget or that the Owners rejected the proposed amounts.

¶24    The Owners also rely on section 2.2 of the Agreement, which provides that the property manager "shall manage, operate and maintain the Property in an efficient, economic, and satisfactory manner and shall manage the performance of everything reasonably necessary for the proper operation of the Property for the tenants thereof . . . [and] shall perform all services in a diligent and professional manner." But this provision speaks to the property manager's duties in performing the contracted services, not to the amount that it can charge for those services.

¶25    The Agreement contains only a single provision linked to market value. Section 11 provides that the property manager "shall not deal with or engage, or purchase goods or services from, any subsidiary or affiliated company of Property Manager in connection with the management of the Property for amounts above market rates." This provision plainly limits the cost of additional items and services that the property manager can purchase on behalf of the Owners from its own subsidiary or affiliate companies in the course of managing the Property, not what the Owners are obligated to pay the property manager for its management of the Property. Further, the parties' use of "market rate" in section 9.1 demonstrates that they knew how to impose a market value limit when that was their intention; the absence of similar language in section 2.2 thus supports the conclusion that the parties did not intend to impose a market value limit on fees. *See, e.g.*, *Skolnick v. Exodus Healthcare Network, PLLC*, 2018 UT App 209, ¶ 21, 437 P.3d 584 (recognizing that the conditional language used in one contractual provision "demonstrates that the parties knew how to make specific obligations . . . conditional when that was their intent").

¶26    In sum, the only contractual limitations on property and asset management fees are the 3% and 2% of gross revenue maximums and the requirement that the fees be set forth in the annual budget submitted by the property manager to the Owners for approval. The Owners have not alleged a breach of either contractual term. Because these terms are the exclusive limitation on property and asset management fees under the Agreement, the Owners cannot state a claim for breach of contract or tortious interference based upon alleged overcharging for fees without alleging that the fees were higher than 3% and 2% of gross revenue or that they were not approved as part of the yearly budget. Given that the amended complaint makes no such allegations, it fails to state a claim for breach of

contract or tortious interference with a contract. The district court did not err in dismissing these claims.

CONCLUSION

¶27 We conclude that the Owners failed to state a claim for breach of a fiduciary duty because the Agreement did not create a fiduciary relationship with respect to fees charged for services. Additionally, because the terms of the Agreement do not limit the management fees to market value, the Owners have not alleged a breach of the Agreement that could support either their contract claim or their claim for tortious interference with a contract. Accordingly, we affirm the district court's order of dismissal.

———————